**2023 IL 127968**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 127968)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v.
KEIRON K. SNEED, Appellant.

*Opinion filed June 15, 2023.*

JUSTICE OVERSTREET delivered the judgment of the court, with opinion.

Chief Justice Theis and Justices Holder White, Cunningham, and Rochford
concurred in the judgment and opinion.

Justice Neville dissented, with opinion.

Justice O'Brien took no part in the decision.

**OPINION**

¶ 1    Defendant, Keiron K. Sneed, was charged in the circuit court of De Witt County
with two counts of forgery (720 ILCS 5/17-3(a)(1) (West 2020)). The charges

stemmed from the discovery of two false paychecks that were payable to defendant, endorsed by him, and cashed and/or deposited via mobile deposit. Police procured a search warrant for defendant's cell phone but were unable to execute the warrant because the cell phone was passcode protected and defendant refused to provide the passcode. Accordingly, the State filed a motion to compel production of the cell phone's passcode.

¶ 2    The circuit court found the fifth amendment privilege against self-incrimination prevented the State from compelling defendant to provide the passcode, as doing so would constitute compelling incriminating testimonial communication. See U.S. Const., amend. V. The circuit court further concluded that the foregone conclusion doctrine did not apply as an exception to bypass the fifth amendment privilege. Therefore, the circuit court denied the State's motion to compel production.[1] The State filed a certificate of substantial impairment, and the matter proceeded to the appellate court.

¶ 3    After determining that it had jurisdiction over the appeal pursuant to Illinois Supreme Court Rule 604(a)(1) (eff. July 1, 2017) (2021 IL App (4th) 210180, ¶ 30), the appellate court concluded that the act of producing a cell phone's passcode is not an incriminating, testimonial communication under the fifth amendment and is therefore not privileged (*id.* ¶ 63). It further concluded that the foregone conclusion doctrine applied,[2] rendering the act of producing the passcode outside the scope of fifth amendment protection. *Id.* ¶ 102. The appellate court reversed the circuit court's order and remanded for further proceedings. *Id.* ¶ 108. We now affirm the judgment of the appellate court, albeit on different grounds.

¶ 4                                    I. BACKGROUND

¶ 5    On February 8, 2021, defendant was charged by information with two counts of forgery (720 ILCS 5/17-3(a)(1) (West 2020)). The information alleged that

_____

[1]The circuit court issued its ruling orally at the conclusion of the hearing on the motion to compel, and a docket entry reflects that the circuit court denied the motion. The record does not include a written order.

[2]Finding the compelled act of producing the passcode was nontestimonial rendered a foregone conclusion analysis unnecessary. Yet the appellate court considered the issue, asserting its conclusion that the doctrine applied as "a second and separate reason" that the circuit court erred in denying the State's motion to compel.

defendant created two false paychecks from Dairy Queen with the intent to defraud Dairy Queen and financial institutions. Defendant and his wife, Allora Spurling Sneed (Spurling), were both arrested in connection with the false paychecks. Upon their arrest, officers seized two cell phones—one from defendant and one from Spurling.

¶ 6                                              A. Search Warrant

¶ 7        On March 1, 2021, Detective Todd Ummel of the Clinton Police Department applied for a search warrant to search the content of both phones. The complaint for search warrant provided as follows. On January 5, 2021, Sara Schlesinger—a bookkeeper for Dairy Queen in Clinton, Illinois—reported that she discovered a paycheck in the amount of $274.33, payable to defendant. Spurling was an employee of Dairy Queen at the time, but defendant was not. The paycheck had been cashed via Citibank mobile deposit. Schlesinger provided text messages between herself and Spurling, in which Spurling acknowledged a forged paycheck but claimed that "it wasn't meant to happen for real. It [*sic*] was being curious and he didn't think it would actually work cuz [*sic*] it wasn't real. *** But please know I had no clue about it[.]" Schlesinger confirmed that funds in the amount of the paycheck were deducted from Dairy Queen's account at State Bank of Lincoln.

¶ 8        The complaint for search warrant further provided that Ummel attempted to interview Spurling, who agreed to meet him on January 7, 2021. However, Spurling did not attend the meeting, claiming she had been exposed to COVID-19. The meeting was rescheduled, but Spurling did not attend, and additional attempts to contact her were unsuccessful.

¶ 9        On February 8, 2021, Schlesinger provided police an additional forged paycheck payable to defendant in the amount of $423.22, which was also deducted from Dairy Queen's account via mobile deposit. According to the endorsement on the back of the check, the amount was to be deposited to Varo Bank.

¶ 10       Ummel's complaint for search warrant sought the following:

"Any and all evidence related to the forging and transmission of paychecks drawn upon the State Bank of Lincoln from the account of Dairy Queen ***, as well as any other forged checks to include:

Photographs and records of paychecks from Dairy Queen

Records of messages sent from the phones of [defendant] and [Spurling] pertaining to the forged paychecks from text messaging applications or other messaging applications such as Facebook, WhatsApp, etc.

Confirmations of deposits from [Citibank], Varo Bank, and any other banks

Emails, messages, and application notifications pertaining to the deposit of checks."

¶ 11 On March 1, 2021, the circuit court issued a search warrant granting officers permission to search both phones.[3]

¶ 12                                   B. State's Motion to Compel

¶ 13 On March 5, 2021, the State filed a motion to compel production of the passcode to defendant's cell phone. The motion alleged that officers were unable to execute the search warrant because defendant's phone was passcode protected. As such, the State requested the circuit court to compel defendant to either provide the passcode or to enter the passcode into his phone. On March 23, 2021, the circuit court conducted a hearing on the motion to compel. At the hearing, Detective Ummel testified that Schlesinger contacted the Clinton Police Department on January 5, 2021, reporting that defendant had cashed fraudulent checks on Dairy Queen's account via mobile deposit from a cell phone. Ummel explained that a mobile deposit consists of photographing a check and submitting it electronically to a financial institution for deposit.

---

[3]Though both phones were seized and the search warrant issued for both, this appeal pertains only to defendant's phone. As such, we limit the balance of our discussion to defendant's phone.

¶ 14 Ummel indicated that he had reviewed photographs of the checks, both of which were payable to and endorsed by defendant.[4] Ummel testified that Spurling admitted via text message that defendant cashed the checks but "[i]t was only a joke, she said," because defendant did not believe the counterfeit checks would successfully deposit. Ummel confirmed that defendant was not a Dairy Queen employee but that Spurling had been and was terminated after the subject events transpired. Ummel indicated that Dairy Queen's bank statements reflected that funds in the amounts of the checks had been deducted from Dairy Queen's account.

¶ 15 Ummel believed defendant's phone contained a photograph of the checks, and he was "hoping to find" such a photograph. Ummel further sought additional files pertaining to the mobile deposits. He conceded, however, that he did not know for certain that any such files existed and that there was currently nothing connecting defendant to the transactions besides Spurling's statements. Ummel added that he had not attempted to subpoena records from defendant's cell phone carrier to obtain copies of text messages.

¶ 16 Ummel testified that officers were unable to execute the search warrant because defendant's phone was passcode protected and defendant refused to provide the passcode. Ummel explained that he was exercising caution, as he knew that too many failed attempts to open a cell phone with the incorrect passcode will permanently lock the phone. Ummel indicated that Clinton Police Department did not have "cell phone cracking" technology and that Illinois State Police would not assist in doing so unless the case involved narcotics. Ummel testified that defendant completed a bond form after his arrest and provided a phone number that matched the seized phone.

¶ 17                               C. Circuit Court's Judgment

¶ 18 The circuit court observed that the fifth amendment applies when the accused is compelled to make an incriminating, testimonial communication. See *Hiibel v. District Court of Nevada*, 542 U.S. 177, 189 (2004). It further observed that an act of production is testimonial for fifth amendment purposes when the accused is

---

[4]The record is devoid of further information about these photographs or any additional details regarding Ummel viewing them.

compelled to make extensive use of his own mind to communicate a statement of fact. See *United States v. Hubbell*, 530 U.S. 27, 43 (2000). The circuit court stressed that the testimonial nature of compelling the production of the passcode was diminished in this case because the phone was found on defendant's person and the bond sheet reflected that defendant identified the phone number associated with the phone as his phone number. The circuit court indicated that, under these facts, defendant's knowledge of the passcode did not provide any further evidence against him than that which already existed and that producing the passcode would not seemingly make extensive use of the contents of defendant's mind. The circuit court opined that disclosing the passcode was "no different than compelling a [d]efendant to disclose a key to a storage unit or a lockbox or something of that nature."

¶ 19        The circuit court asserted that "an objective, reasonable judge could reach the conclusion that the production of the [passcode] is not testimonial." However, it emphasized that it was obligated to follow the precedent established by the Appellate Court, Third District, in *People v. Spicer*, 2019 IL App (3d) 170814, which made clear that the compelled production of a cell phone passcode is testimonial and thus privileged under the fifth amendment, and for purposes of the foregone conclusion exception (see *Fisher v. United States*, 425 U.S. 391, 411 (1976)), the proper focus is not on the passcode but on the information protected by the passcode.

¶ 20        Applying those principles, the circuit court observed that Spurling's statements were the only evidence linking defendant's phone to the transactions in question and it would be speculative to presume that a photograph of the checks would remain on the phone after the transactions were complete. Though the circuit court did not perceive the State's endeavor as a fishing expedition, it concluded that the State did not establish with reasonable particularity that, at the time it sought the act of production, it knew the evidence existed, the evidence was in defendant's possession, and the evidence was authentic. See *Hubbell*, 530 U.S. at 40-41. On that basis, the circuit court concluded that the foregone conclusion doctrine did not apply as an exception to bypass the protections of the fifth amendment and denied the State's motion to compel. The State filed a certificate of substantial impairment, and the matter proceeded to the appellate court.

¶ 21                              D. Appellate Court's Judgment

¶ 22        The Appellate Court, Fourth District, accepted the State's good-faith evaluation
in its certificate of substantial impairment, which indicated that the circuit court's
order substantially impaired its ability to prosecute the case. 2021 IL App (4th)
210180, ¶¶ 33-34. The appellate court agreed that the order was "like an order
suppressing evidence" and concluded it had jurisdiction to consider the appeal
under Illinois Supreme Court Rule 604(a)(1) (eff. July 1, 2017). 2021 IL App (4th)
210180, ¶ 34.

¶ 23        In considering the merits, the appellate court recognized that the circuit court
concluded as it did because it was bound by *Spicer*, which was the only Illinois
precedent on the issue. *Id. ¶* 62. In *Spicer*, a cell phone was found on the
defendant's person when he was searched incident to arrest. 2019 IL App (3d)
170814, ¶ 4. Officers procured a search warrant for the phone. *Id.* The phone was
passcode protected, and because the defendant refused to provide the passcode, the
State filed a motion to compel the defendant to produce the passcode. *Id.* The circuit
court denied the motion to compel, finding the State's request implicated
defendant's fifth amendment right against self-incrimination. *Id. ¶* 7. The circuit
court further found the foregone conclusion exception did not apply because the
State did not know what evidence was on the phone but had merely indicated the
phone "probably" contained incriminating evidence. *Id.*

¶ 24        At the time of the *Spicer* litigation, there was no Illinois precedent on the issue.
*Id.* ¶ 16. Accordingly, the *Spicer* court observed *G.A.Q.L. v. State*, 257 So. 3d 1058,
1060 (Fla. Dist. Ct. App. 2018), in which the State of Florida moved to compel the
defendant to provide passcodes to his phone and iTunes account. The circuit court
granted the motions to compel. *Id.* The reviewing court in *G.A.Q.L.* found that
compelling the production of the passcodes resulted in " 'implied factual
statements' " and necessitated using the mind, not to "obtain[ ] the decryption for
its own sake, but for the purpose of obtaining the files protected by the encryption."
*Id.* at 1062 (quoting *In re Grand Jury Subpoena Duces Tecum Dated March 25,
2011*, 670 F.3d 1335, 1346 (11th Cir. 2012)). Finding the State did not seek the
passcodes but information on the phone, the reviewing court determined that the
defendant was compelled to use his mind and demonstrate the fact that he could
access his phone. *Id.* On that basis, the reviewing court concluded that compelling

the defendant to reveal the passcodes was testimonial for fifth amendment purposes. *Id.* at 1062-63.

¶ 25 After determining that the act of producing the passcodes was testimonial, the *G.A.Q.L.* court examined the foregone conclusion doctrine. *Id.* at 1063. In doing so, the court focused on the contents of the phone rather than the passcode and concluded that the foregone conclusion exception did not apply because the State failed to show that it knew with reasonable particularity the existence of the contents of the phone. *Id.* at 1064-65. The court indicated it was insufficient to merely infer that any evidence existed but, rather, the State must identify with reasonable particularity what evidence existed beyond the passcode wall. *Id.* at 1064.

¶ 26 The *Spicer* court adopted the analysis and conclusion of *G.A.Q.L.*, asserting that likewise, in its case, the State was not pursuing the passcode itself but information beyond the passcode wall. *Spicer*, 2019 IL App (3d) 170814, ¶ 21. The *Spicer* court noted contrary decisions finding the foregone conclusion exception applicable because the focus in those cases was on the passcode. *Id.* Conversely, the *Spicer* court concluded that the proper focus is on the information the passcode protects rather than on the passcode itself. *Id.* Applied to its case, the *Spicer* court indicated that the State was required to show the information on the phone with reasonable particularity but that it failed to do so. *Id.* Thus, the *Spicer* court concluded that the foregone conclusion exception did not apply to bypass the protections of the fifth amendment. *Id.* ¶ 22.

¶ 27 In this case, the appellate court declined to follow *Spicer* and concluded that the compelled production of the passcode is nontestimonial, reasoning that a passcode may be used so often that retrieving it "is a function of muscle memory rather than an exercise of conscious thought." 2021 IL App (4th) 210180, ¶ 59. The appellate court asserted that "a cell phone passcode is more akin to a key to a strongbox than a combination to a safe." *Id.* ¶ 60. See *Doe v. United States*, 487 U.S. 201, 210 n.9 (1988) (compelling the execution of an authorization is more like surrendering a key than revealing a combination to a safe); *cf. Hubbell*, 530 U.S. at 43 (compiling hundreds of documents analogous to revealing the combination to a wall safe rather than surrendering a key to a strongbox).

- 8 -

¶ 28    The appellate court further observed *United States v. Oloyede*, 933 F.3d 302, 309 (4th Cir. 2019), which suggested that unlocking a phone may not be testimonial if (1) it is settled the defendant owns the phone, (2) the defendant is not requested to reveal the passcode to officers, and (3) the defendant makes the contents of the phone accessible to officers by entering the passcode without revealing it. 2021 IL App (4th) 210180, ¶ 61. Applying *Oloyede* here, the appellate court observed the State requested an order for defendant to "provide entry" to his phone, meaning that defendant—like the *Oloyede* defendant—could enter the passcode and make its contents accessible without revealing it to officers. *Id.* For these reasons, the appellate court concluded that compelling defendant to produce the passcode was nontestimonial for purposes of the fifth amendment. *Id.* ¶ 63.

¶ 29    Though the appellate court found the act of producing the passcode is nontestimonial—thus rendering a foregone conclusion analysis unnecessary—it nevertheless considered the foregone conclusion doctrine as a "second and separate reason for holding that the trial court erred by denying the State's motion." *Id.* ¶ 66. The appellate court found that, in applying the foregone conclusion doctrine, the *Spicer* court erroneously focused on the contents of the phone. *Id.* ¶ 81. Opposing *Spicer*, the appellate court held that the foregone conclusion test applies to the act of producing the passcode rather than to the phone's contents. *Id.*

¶ 30    Under that framework, the appellate court indicated that, for the foregone conclusion exception to apply, the State must show with reasonable particularity that "(1) it knows the passcode exists, (2) the passcode is within the defendant's possession or control, and (3) the passcode is authentic." *Id.* ¶ 98. The appellate court found the State met that burden and concluded that the foregone conclusion exception applied, rendering the act of producing the passcode outside the purview of fifth amendment protection. *Id.* ¶ 102. The appellate court reversed the judgment of the circuit court and remanded for further proceedings. *Id.* ¶ 108. This court allowed defendant's petition for leave to appeal. Ill. S. Ct. R. 315(a) (eff. Oct. 1, 2021).

¶ 31                                    II. ANALYSIS

¶ 32    Defendant raises the following issues on appeal, which we have restated as follows: (a) whether the circuit court's order is appealable under Rule 604(a)(1)

and (b) whether, if compelling defendant to produce the passcode to his cell phone implicates the fifth amendment privilege against self-incrimination, the foregone conclusion doctrine applies as an exception to that privilege.

¶ 33    Before proceeding with our analysis, we acknowledge that this court granted a motion of Indiana, Arkansas, Florida, Idaho, Louisiana, Minnesota, Mississippi, New Jersey, North Dakota, Oklahoma, Oregon, South Carolina, South Dakota, Utah, and Virginia (collectively, *amici* states) to file an *amicus curiae* brief in support of the State's position on appeal. See Ill. S. Ct. R. 345 (eff. Sept. 20, 2010). Besides agreeing with the State that an order compelling a defendant to unlock a cell phone does not violate the fifth amendment where the knowledge of the passcode is a foregone conclusion, the *amicus curiae* brief also focuses on securing assistance with unlocking encrypted devices, which the *amici* states perceive as important for the effective investigation, prosecution, and prevention of crimes.

¶ 34    We also granted a motion of the American Civil Liberties Union of Illinois, the Electronic Frontier Foundation, the National Association of Criminal Defense Lawyers, and the Illinois Association of Criminal Defense Lawyers to file an *amicus curiae* brief in support of defendant's stance that compelling a defendant to enter a passcode is testimonial under the fifth amendment and that the foregone conclusion doctrine does not apply as an exception to the fifth amendment privilege. We bear in mind the respective positions of the *amici* as we proceed with our analysis of the issues on appeal.

¶ 35                    A. Jurisdiction

¶ 36    At the outset, we consider whether the circuit court's judgment is appealable under Rule 604(a)(1). " 'Under the 1970 Illinois Constitution, the final authority to prescribe the scope of interlocutory appeals by the State in a criminal case rests exclusively with this court [citation], and whether a particular order may be appealed depends solely upon our construction of our Rule 604(a)(1).' " *People v. Drum*, 194 Ill. 2d 485, 488 (2000) (quoting *People v. Young*, 82 Ill. 2d 234, 239 (1980)). Like a statute, the interpretation of a supreme court rule is a question of law requiring *de novo* review. *Id.*

¶ 37        Illinois Supreme Court Rule 604(a)(1) (eff. July 1, 2017) limits State appeals in criminal cases, providing, in relevant part: "In criminal cases the State may appeal only from an order or judgment the substantive effect of which results in *** quashing [a] *** search warrant[, or] suppressing evidence ***." The State's appeal is also limited to orders that substantially impair the prosecution. *Young*, 82 Ill. 2d at 247. Accordingly, an interlocutory appeal by the State is permitted under Rule 604(a)(1) when the substantive effect of the underlying order results in quashing a search warrant or suppressing evidence and when the prosecutor certifies that the order "substantially impairs the State's ability to prosecute the case." *Id.*

¶ 38        In examining a certificate of substantial impairment, this court "rel[ies] solely upon the good-faith evaluation by the prosecutor of the impact of the [appealable] order on his case," and it is not the role of reviewing courts to second-guess that evaluation. *Id.*; see also *People v. Keith*, 148 Ill. 2d 32, 40 (1992). The principle of the prosecutor's good-faith evaluation comes into play only if the circuit court's order has the substantive effect of suppressing evidence or quashing the search warrant. See *People v. Truitt*, 175 Ill. 2d 148, 152 (1997), *abrogated in part on other grounds by People v. Miller*, 202 Ill. 2d 328 (2002). In other words, it must first be determined that the substantive effect of the order is to suppress evidence or quash a search warrant before the certificate of substantial impairment is considered. See *id.*

¶ 39        Here, defendant argues that the circuit court's judgment denying the motion to compel did not have the substantive effect of quashing the search warrant or suppressing evidence. Defendant stresses that the judgment did not invalidate the search warrant but only limited the *means* by which the State could pursue the search warrant. Thus, defendant maintains that the judgment is not appealable under Rule 604(a)(1).

¶ 40        Defendant cites *In re K.E.F.*, 235 Ill. 2d 530 (2009), and *People v. Lee*, 2020 IL App (5th) 180570, to support his argument. In both cases, the State sought to admit into evidence prior videotaped statements of witnesses, and in both cases, the circuit court found the statements inadmissible because the State failed to meet the burden for admitting evidence. *K.E.F.*, 235 Ill. 2d at 539-40; *Lee*, 2020 IL App (5th) 180570, ¶ 6.

¶ 41    In *K.E.F.*, this court found the circuit court's order unappealable because it did not have the substantive effect of suppressing evidence, as the admissibility of the evidence was "entirely within the State's control." 235 Ill. 2d at 540. This court observed that the order did not prevent information from being presented to the factfinder but only impacted the *means* by which the information could be presented, which did not constitute suppression of evidence. *Id.* On that basis, this court concluded that the circuit court's order was unappealable under Rule 604(a)(1). *Id.* at 540-41.

¶ 42    The *Lee* court observed that the conclusion in *K.E.F.* was based on the fact that the circuit court's judgment left the State with another option to present the pertinent information through live testimony. *Lee*, 2020 IL App (5th) 180570, ¶ 23. The *Lee* court found "no meaningful distinction on this dispositive point" and concluded that it lacked jurisdiction to consider the State's appeal. *Id.*

¶ 43    Here, defendant maintains that *K.E.F.* and *Lee* apply, as the circuit court's judgment denying the State's motion to compel only addressed the *means* by which the State could pursue the search warrant. He asserts that the circuit court acknowledged the validity of the search warrant and did not issue an order preventing the State from pursuing the evidence by some other means. Thus, defendant contends that the circuit court's judgment did not have the substantive effect of quashing the search warrant.

¶ 44    Defendant adds that the circuit court did not suggest that the State would be barred from presenting any evidence at trial and that the State has not established that it will actually find any evidence on the phone. As such, defendant maintains that the circuit court's judgment did not have the substantive effect of suppressing evidence.

¶ 45    The State responds that the order prevented police from executing the search warrant because, unless defendant enters the passcode, there is no means to access the evidence on the phone. Accordingly, the State contends that the order is appealable by the plain terms of Rule 604(a)(1) because it had the substantive effect of quashing the search warrant. The State further contends that the order is appealable because it had the substantive effect of suppressing evidence. The State explains that the search warrant issued for evidence that may be stored only on the

phone and that the order prevented any such evidence from being presented to the factfinder. We agree with the State.

¶ 46    The existence of another means of pursuing evidence has no bearing on the ultimate question posed by Rule 604(a)(1) as applied to the facts of this case: whether the circuit court's order denying the State's motion to compel has the substantive effect of quashing the search warrant or suppressing the evidence. We find defendant's cited cases distinguishable on their facts, as neither involved search warrants or motions to compel production. Rather, both cases involved motions to admit evidence that was readily presentable to the factfinder, already in the State's possession, and "entirely within the State's control." See *K.E.F.*, 235 Ill. 2d at 533, 540; *Lee*, 2020 IL App (5th) 180570, ¶¶ 5, 21. In contrast, here, the evidence is not in the State's possession, not "entirely within the State's control," and thus not readily presentable to the factfinder. See *K.E.F.*, 235 Ill. 2d at 533, 540; *Lee*, 2020 IL App (5th) 180570, ¶¶ 5, 21. Rather, the State sought to obtain evidence on defendant's phone by means of the search warrant, and evidence on the phone was not obtained because the circuit court denied the State's motion to compel. Accordingly, we find *K.E.F.* and *Lee* inapplicable here.

¶ 47    We further note that in *Spicer*—the precedent on which defendant relies to support his fifth amendment arguments—the court considered this jurisdictional issue and stated that, "[w]hen a warrant has been issued allowing a search of a defendant's phone, an order that denies a motion to compel the defendant to decrypt the phone is like an order suppressing evidence." 2019 IL App (3d) 170814, ¶ 11. On that basis, the *Spicer* court concluded that it had jurisdiction to consider the appeal under Rule 604(a)(1). *Id.* ¶ 12. The appellate court here observed the jurisdictional analysis in *Spicer* and likewise concluded it had jurisdiction. 2021 IL App (4th) 210180, ¶ 34.

¶ 48    Defendant cites no Illinois authority contrary to these jurisdictional decisions. However, defendant argues that *Spicer* based its conclusion on the Third District's previous decision in *People v. Krause*, 273 Ill. App. 3d 59 (1995), which defendant contends misinterpreted this court's decision in *Keith* as requiring reliance on the State's certificate of substantial impairment in determining the substantive effect of the circuit court's order. Defendant adds that *Krause* was decided without the benefit of the guidance provided by this court in the more recent *K.E.F.*

¶ 49     Though we find *K.E.F.* distinguishable on its facts, defendant cites this court's statement in *K.E.F.* that whether an order is appealable depends on the substantive effect of the order and, "[i]n making that determination, we do not defer to the parties or the circuit court." *K.E.F.*, 235 Ill. 2d at 538. Defendant maintains that, here, the appellate court relied on the assertions in the State's certificate of substantial impairment to determine the substantive effect of the circuit court's order under Rule 604(a)(1), which defendant argues "is directly contrary to *K.E.F.*" We disagree.

¶ 50     The appellate court did not determine the substantive effect of the order based on the State's certificate but on the statement in *Spicer* that, " '[w]hen a warrant has issued allowing a search of a defendant's phone, an order that denies a motion to compel the defendant to decrypt the phone is like an order suppressing evidence.' " 2021 IL App (4th) 210180, ¶ 32 (quoting *Spicer*, 2019 IL App (3d) 170814, ¶ 11). It was after observing this quote in *Spicer* that the appellate court considered the State's certificate, which indicated that the circuit court's order substantially impaired its ability to prosecute the case. *Id.* ¶¶ 32-33.

¶ 51     Subsequently, the appellate court indicated two things: (1) it "accept[ed] the State's good[-]faith evaluation of the impact of the trial court's order on its ability to prosecute its case," and (2) it "agree[d] that the trial court's order [was] like an order suppressing evidence." *Id.* ¶ 34. We agree that the substantive effect of the underlying order is a separate question that must be addressed *before* the prosecutor's evaluation in the certificate is considered. See *Truitt*, 175 Ill. 2d at 152. We further acknowledge that, in the aforementioned statement, the appellate court noted its acceptance of the prosecutor's evaluation before assenting that the order had the substantive effect of suppressing evidence.

¶ 52     Notwithstanding its wording arrangement, the appellate court nonetheless employed the above quote from *Spicer* before considering the State's certificate. Moreover, in its analysis, the appellate court separated the principles of the substantive effect of the circuit court's order and the State's certificate and made two independent findings based on those principles.

¶ 53     The appellate court's statement that the order was "like an order suppressing evidence" was a clear reference to the quote in *Spicer*, upon which the appellate court based its determination regarding the substantive effect of the order. See 2021

IL App (4th) 210180, ¶ 34. There is no indication that the appellate court deferred to the State or relied on its certificate to determine the substantive effect of the circuit court's order as defendant suggests.

¶ 54    It is of no consequence that, in the State's certificate, the prosecutor commented on the substantive effect of the order by indicating that the order "effectively suppress[ed] evidence and *** effectively quash[ed] the search warrant." Notwithstanding these assertions, the appellate court's conclusion regarding the substantive effect of the order was independent of its consideration of the certificate. As such, we reject defendant's argument that the appellate court relied on the State's certificate of substantial impairment to determine the substantive effect of the circuit court's order under Rule 604(a)(1).

¶ 55    The search warrant issued allowing a search of defendant's phone, and the circuit court entered an order denying the State's motion to compel defendant to provide the passcode to the phone. In determining whether the circuit court's order effectively quashed the search warrant, we observe that the definition of "quash" is "[t]o annul or make void; to terminate." Black's Law Dictionary (11th ed. 2019). Here, the search warrant authorized officers to search defendant's phone and required defendant to unlock the phone so officers could execute the warrant. The circuit court's denial of the motion to compel eliminated the requirement for defendant to comply with the search warrant. As such, we conclude that the circuit court's order annulled or voided the search warrant; thus, it had the substantive effect of quashing the search warrant.

¶ 56    We further conclude that the circuit court's denial of the motion to compel effectively suppressed evidence. Although the denial did not directly suppress specifically identified evidence, it prevented the State from accessing any evidence on the phone and presenting it to the factfinder, thereby having the substantive effect of suppressing evidence. See *K.E.F.*, 235 Ill. 2d at 540.

¶ 57    Having determined the substantive effects of the circuit court's judgment, we now consider the State's certificate. Defendant argues that the circuit court's order did not substantially impair the State's ability to prosecute this case and that any impairment is questionable at best. Citing *Keith*, defendant contends that, although a reviewing court is permitted "to rely *somewhat* on the State's certificate as to the

issue of impairment [citation], it does not seem necessary for a court to abandon logic in doing so." (Emphasis added.)

¶ 58    Defendant misrepresents *Keith*, in which this court articulated and implemented its former statement in *Young* that " 'we rely *solely* upon the good-faith evaluation by the prosecutor of the impact of the *** order on his case.' " (Emphasis added.) *Keith*, 148 Ill. 2d at 40 (quoting *Young*, 82 Ill. 2d at 247). We reject defendant's suggestion to rely *somewhat* on the State's certificate. In the State's certificate, the prosecutor evaluated the effect of the circuit court's order and indicated that the order substantially impaired the ability to prosecute the case. We accept that good-faith evaluation. See *Young*, 82 Ill. 2d at 247.

¶ 59    We conclude that we have jurisdiction to consider this appeal under Rule 604(a)(1), as the substantive effect of the underlying order results in both quashing the search warrant and suppressing evidence, and the order substantially impaired the State's ability to prosecute the case.

¶ 60                    B. Fifth Amendment Privilege and the
                        Foregone Conclusion Doctrine

¶ 61    Having established our jurisdiction over this appeal, we turn to the merits and address the remaining issue: whether, if compelling defendant to produce the passcode to his cell phone implicates the fifth amendment privilege against self-incrimination, the foregone conclusion doctrine applies as an exception to that privilege. "The standard of review for determining whether an individual's constitutional rights have been violated is *de novo*." *In re Robert S.*, 213 Ill. 2d 30, 45 (2004). However, we give substantial deference to any factual findings made by the circuit court with regard to defendant's fifth amendment challenge and will reverse those findings only where they are against the manifest weight of the evidence. *People v. Braggs*, 209 Ill. 2d 492, 505 (2003).

¶ 62                    1. United States and Illinois Constitutions

¶ 63    The fifth amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S.

- 16 -

Const., amend. V. Strikingly similar, article I, section 10, of the Illinois Constitution provides that "[n]o person shall be compelled in a criminal case to give evidence against himself." Ill. Const. 1970, art. I, § 10. These provisions of the federal and state constitutions "differ in semantics rather than in substance and have received the same general construction." *People ex rel. Hanrahan v. Power*, 54 Ill. 2d 154, 160 (1973). The provisions are "virtually identical" and are to be interpreted in lockstep absent substantial grounds to depart from the federal interpretation. *Relsolelo v. Fisk*, 198 Ill. 2d 142, 149-50 (2001).

¶ 64　　　Though defendant suggests that the rights protected by the privilege "can be [broader] under the State constitution in some cases," he fails to provide the substantial grounds necessary to justify a departure from the lockstep interpretation in this case. See *id.* Attempting to support his claim, defendant asserts that the Illinois Constitution of 1970 "reflected an intention that the existing state of the law remain unchanged" and that the existing law when the Illinois Constitution was adopted was that the fifth amendment applied not only to compelled testimony but also to the compelled production of private books and papers. See *Boyd v. United States*, 116 U.S. 616, 630-35 (1886).

¶ 65　　　Defendant avers that it was not until *Fisher*, 425 U.S. 391, that the United States Supreme Court narrowed the rule in *Boyd* by establishing that the compelled production of private papers is permissible if facets of the production are invalidated by the State's knowledge. Defendant urges that—to the extent the Illinois Constitution recognized the rule in *Boyd* as the existing law—this court should not apply *Fisher*, which restricts that rule as it applies to the Illinois privilege against self-incrimination. We decline to honor defendant's request.

¶ 66　　　This court established that "[t]here is nothing in the proceedings of the constitutional convention to indicate an intention to provide, in article I, section 10, protections against self-incrimination broader than those of the Constitution of the United States." *People v. Rolfinsmeyer*, 101 Ill. 2d 137, 142 (1984). Indeed, those proceedings "reflect[ ] a general recognition and acceptance of interpretations by the United States Supreme Court" (*id.*) and an intent "that the existing state of the law would remain unchanged" (internal quotation marks omitted) (*id.*), with "[t]he existing state of the law at that time [being] lockstep interpretation of identical or nearly identical language" (*People v. Caballes*, 221 Ill. 2d 282, 293-94 (2006)).

¶ 67 Furthermore, *Fisher* is wholly applicable to the instant case, as it is the seminal precedent for the act of production doctrine. We refuse to disregard it to accommodate defendant's attempt to broaden the scope of the privilege under the Illinois Constitution as opposed to the United States Constitution. For these reasons, we find defendant failed to provide the substantial grounds necessary to warrant departing from the lockstep interpretation and to interpret the Illinois provision as "applying more expansively" than the federal provision in this case. See *Relsolelo*, 198 Ill. 2d at 149-50.

¶ 68                                  2. Fifth Amendment Principles

¶ 69 A communication violates the fifth amendment if it is testimonial, incriminating, and compelled. *Hiibel*, 542 U.S. at 189. Notably, in the appellate court, the State argued—and the appellate court concluded—that the compelled act of producing the passcode to the phone is nontestimonial for fifth amendment purposes. See 2021 IL App (4th) 210180, ¶ 63. However, before this court, the State now concedes that the compelled act of entering the passcode is testimonial,[5] thus satisfying the testimonial requirement.[6] The compulsion requirement is also satisfied, as the State filed a motion to compel defendant to produce the passcode to his phone.

¶ 70 Regarding the incrimination requirement, defendant maintains that the privilege applies to compelled communication that leads to the discovery of incriminating evidence even if the communication itself is neither incriminating nor introduced into evidence. See *Hubbell*, 530 U.S. at 37. We agree but stress that the requirement for the compelled production to be "testimonial" is separate from the requirement for the production to be "incriminating." Moreover, "[i]f a compelled statement is 'not testimonial and for that reason not protected by the privilege, it cannot become [testimonial] because it will lead to incriminating evidence.' " *Doe*, 487 U.S. at 208

---

[5]The State notes the distinction between producing a passcode by entering it, as opposed to disclosing it to officers. Because the State's motion to compel sought an order that defendant either enter the passcode or disclose it to officers, compliance with the order would not require that defendant disclose the passcode. Thus, the State's discussion of the act of producing a passcode refers to the act of producing it by entering in into an encrypted phone rather than by disclosing it.

[6]Though the State concedes that the act is testimonial, we discuss this aspect in greater detail, *infra*, because the parties disagree as to *why* the act is testimonial.

- 18 -

n.6 (quoting *In re Grand Jury Subpoena*, 826 F.2d 1166, 1171 n.2 (2d Cir. 1987) (Newman, J., concurring)).

¶ 71 Although the State concedes that the act of entering the passcode is testimonial, we ultimately conclude that the testimony implicit in that act is a "foregone conclusion" and thus insufficiently testimonial to be privileged under the fifth amendment. See *Fisher*, 425 U.S. at 411. Accordingly, it is irrelevant that producing the passcode may lead to incriminating evidence. See *Doe*, 487 U.S. at 208 n.6.

## 3. Act of Production Doctrine

¶ 73 The United States Supreme Court articulated the act of production doctrine in *Fisher*, asserting that "[t]he act of producing evidence in response to a subpoena *** has communicative aspects of its own, wholly aside from the contents of the [evidence] produced." 425 U.S. at 410. Therefore, the act of production doctrine allows a person to assert his fifth amendment privilege where the mere act of production itself—as opposed to the content of what is being produced—has testimonial implications. See *id.*

## 4. Testimonial

¶ 75 Again, the State concedes that the compelled act of entering the passcode is testimonial, thus implicating the fifth amendment. However, the parties' disagreement as to *why* the act is testimonial merits discussion. Acts that produce evidence are testimonial under the fifth amendment to the extent that performing such acts "implicitly communicate[s] statements of fact." (Internal quotation marks omitted.) *Hubbell*, 530 U.S. at 36; see also *Doe*, 487 U.S. at 210 (to be testimonial, an act must implicitly or explicitly disclose information or convey a factual assertion). Under this rubric, in *Hubbell*, the United States Supreme Court concluded that the testimonial aspect of a compelled act of production "does nothing more than establish the existence, authenticity, and custody of items that are produced." 530 U.S. at 40-41. Put another way, there are three assertions of fact implicit in a compelled act of producing evidence because the facts are necessary prerequisites to the performance of the act. Those implicit facts are that (1) the

evidence exists, (2) the person producing the evidence possesses or controls it, and (3) the evidence produced is authentic. *Id.*

¶ 76        The State concedes that compelling the production of the passcode is testimonial, but only to the extent that the act implicitly asserts the fact that defendant is able to unlock the phone, which establishes that the passcode exists, defendant possesses or controls the passcode, and the passcode produced is authentic. See *id.* The State acknowledges that many other facts may be inferred by a person entering a passcode, *i.e.*, the phone is registered in the person's name, the person made phone calls or sent text messages using the phone, or the person knows what information is stored on the phone. However, the State explains that, because none of those facts *must* be true for the person to have entered the passcode, none of them are implicitly asserted by the act of entering the passcode.

¶ 77        The State proposes that a cell phone is a container, that entering the phone's passcode merely opens the container, and that the testimony implicit in producing access to the container is different from the testimony implicit in producing the contents of the container. The State explains that compelling a defendant to unlock a phone by entering its passcode is analogous to compelling a defendant to unlock a door by using its key; entering the passcode says nothing about what lies beyond the passcode wall just as unlocking a door says nothing about what lies behind the door.

¶ 78        We find that compelling the act of entering a passcode to a cell phone is testimonial to the extent that performing the act implicitly asserts that the person entering it has the ability to unlock the phone. This implicit assertion is broken down into three components: (1) the passcode exists, (2) the person producing the passcode possesses or controls it, and (3) the passcode produced is authentic. See *id.*

¶ 79        Defendant argues that the compelled act of producing the passcode to his cell phone is testimonial, as it requires "delving into the contents" of his mind (see *Hubbell*, 530 U.S. at 43) and revealing facts not already known by the State. Defendant cites *Seo v. State*, 148 N.E.3d 952, 953 (Ind. 2020), in which the Indiana Supreme Court concluded that compelling the defendant to unlock her phone violated her fifth amendment privilege. The *Seo* court determined that compelling the production of the passcode conveys that (1) the person knows the passcode,

(2) the files on the phone exist, and (3) the person has control over and possession of those files. *Id.* at 955.

¶ 80    Applying *Seo* here, defendant contends that the compelled act of producing the passcode conveys information to the State that it did not previously know, *i.e.*, that defendant knows the passcode, that files exist on the phone, and that defendant has possession and control of those files. See *id.* Defendant adds that the act is protected by the fifth amendment privilege unless the State can show it already knew this information under the foregone conclusion exception. We disagree.

¶ 81    In *Seo*, the court conflated the act of entering a phone's passcode with the act of producing files from the phone and intermingled those two acts in reaching its conclusion. We agree with *Seo* to the extent that a fact implicit in the act of entering a passcode is that the person knows the passcode. See *id.* However, unlike *Seo*, we observe that the passcode may be entered, regardless of whether any files exist on the phone and regardless of whether the person even has knowledge of—much less possession of or control over—any files. See *id.* For these reasons, *Seo* has no application here.

¶ 82    We further disagree that compelling defendant to enter the passcode is testimonial because it delves into the contents of defendant's mind. The appellate court in this case aptly observed that "a cell phone passcode is a string of letters or numbers that an individual habitually enters into his electronic device throughout the day" and it "may be used so habitually that its retrieval is a function of muscle memory rather than an exercise of conscious thought." 2021 IL App (4th) 210180, ¶ 59. We agree that entering a passcode to a cell phone bears no resemblance to the "extensive use of the contents of [the respondent's] mind" that was required to produce the hundreds of documents in *Hubbell*. (Internal quotation marks omitted.) *Hubbell*, 530 U.S. at 43.

¶ 83    We find it fitting to compare the phone to a container and the passcode to a key and that entering the phone's passcode opens the container just as using a key unlocks a door. There are many ways to unlock modern cell phones. Besides entering a passcode using a series of letters and/or numbers, cell phones may also be unlocked biometrically by using one's fingerprint, facial recognition technology, or retina scans. See *State v. Stahl*, 206 So. 3d 124, 135 (Fla. Dist. Ct. App. 2016);

*State v. Andrews*, 234 A.3d 1254, 1274 (N.J. 2020); Thomas A. Drysdale, *I Can't Quite Put My Finger on It*, 108 Ill. B.J. 26 (2020).

¶ 84    Regardless of what method is used to unlock a cell phone, we find them all equally comparable to using a key to unlock a door, and we decline to distinguish between the methods for purposes of fifth amendment application. We would place form over substance to grant greater fifth amendment protection to those who choose to secure their cell phones with a numeric passcode than to those who choose to do so biometrically. See *Stahl*, 206 So. 3d at 135 (no greater fifth amendment protection warranted for those using number and letter combinations to protect their phones over those using their fingerprints); see also *Andrews*, 234 A.3d at 1274 (holding passcodes exempt from compelled production and biometric codes subject to compelled production is inconsistent and places form over substance).

¶ 85    In sum, we conclude that compelling defendant to enter the passcode to his cell phone is testimonial—not because it involves delving into the contents of defendant's mind—but because entering the passcode implicitly asserts that defendant is able to unlock the phone, which establishes that the passcode exists, defendant possesses or controls the passcode, and the passcode is authentic. See *Hubbell*, 530 U.S. at 40-41. Because the act of entering the passcode is testimonial, the fifth amendment is implicated, thus warranting a foregone conclusion analysis.

¶ 86                            5. Foregone Conclusion Doctrine

¶ 87    The foregone conclusion doctrine is an exception to the fifth amendment privilege. *Fisher*, 425 U.S. at 411. If the testimony implicit in a compelled act is a "foregone conclusion," it "adds little or nothing to the sum total of the [State's] information" and is thus insufficiently testimonial to be privileged under the fifth amendment. *Id.* In other words, the act of production is a foregone conclusion and has no testimonial value where the information derived from the act is already known by the State. See *id.* The foregone conclusion exception applies where the State establishes that, at the time it sought the act of production, it knew with "reasonable particularity" that (1) the evidence existed, (2) the evidence was in defendant's possession or control, and (3) the evidence was authentic. See *Hubbell*,

530 U.S. at 40-41.

¶ 88                    a. *Whether the Foregone Conclusion Doctrine Applies at All*

¶ 89       At the outset, defendant argues that the foregone conclusion doctrine does not apply to the circumstances of this case, reasoning that, historically, the foregone conclusion exception applied to cases involving subpoenaed tax documents or business records and the exception should not be extended to apply to the production of a cell phone passcode.

¶ 90       Defendant cites *Seo*, which raised three concerns with applying the exception to cases involving the unlocking of phones. See 148 N.E.3d at 958-62. First, the *Seo* court opined that, when the *Fisher* court introduced the foregone conclusion exception in the context of the compelled production of business records, it is unlikely the court imagined it applying to the compelled production of passcodes to cell phones, which are capable of storing massive amounts of information. *Id.* at 959-60.

¶ 91       Second, the *Seo* court asserted that the foregone conclusion exception may prove unworkable, given the amount of information contained on modern phones to which access would be provided. *Id.* at 960. The *Seo* court noted—in the context of focusing on the content of the phone—that under the foregone conclusion exception, the government should only be provided those files it can establish knowledge of with reasonable particularity and that unlocking a phone provides broad access not only to the known files, but also to the phone in its entirety. *Id.*

¶ 92       Third, the *Seo* court stated that existing precedent and the narrow application of the foregone conclusion exception weighs against extending it, noting that *Fisher* is the only United States Supreme Court decision in which the foregone conclusion exception has ever applied and that the only two cases discussing the exception—without applying it—did so in the context of grand jury proceedings involving subpoenaed business records. *Id.* at 961. The *Seo* court highlighted the United States Supreme Court's caution that "when 'confronting new concerns wrought by digital technology,' [the Court] 'has been careful not to uncritically extend existing precedents.' " *Id.* (quoting *Carpenter v. United States*, 585 U.S. ___, ___, 138 S. Ct. 2206, 2222 (2018)).

¶ 93    In addition to *Seo*, defendant cites *Commonwealth v. Davis*, 220 A.3d 534 (Pa. 2019), in which the Pennsylvania Supreme Court refused to apply the foregone conclusion exception to the compelled production of computer passwords (*id.* at 550-52), reasoning that it would significantly expand the rationale of the exception to apply it beyond the context of business records (*id.* at 549). The *Davis* court asserted that applying "the foregone conclusion rationale in these circumstances would allow the exception to swallow the constitutional privilege." *Id.*

¶ 94    Defendant stresses that modern phones are capable of storing vast amounts of information and that compelling the production of a phone's passcode compels production of all the information on the phone, in contrast to the specific documents at issue in *Fisher* and its progeny. Accordingly, defendant maintains that applying the foregone conclusion exception here risks allowing the exception to swallow the privilege as applying it to the computer password in *Davis* would have.

¶ 95    The State responds that the foregone conclusion exception applies here because cell phone passcodes have no characteristics requiring that they be uniquely privileged under the fifth amendment. The State notes that, while the *Fisher* court did not announce a universal test to determine the scope of the fifth amendment, the foregone conclusion test was created by applying basic fifth amendment principles and the test has since been repeatedly described in broad terms and has applied to compelled acts besides the production of documents.

¶ 96    The State submits that *Davis* is an outlier with unsound reasoning. The *Davis* court stated that the cases in which the foregone conclusion test applied concerned production of business records, which *Davis* identified as "a unique category of material" for fifth amendment purposes. *Id.* The State points out that, though the *Davis* court described business records as "unique," it did not elaborate on what was unique about acts of producing business records in comparison to acts of producing other evidence.

¶ 97    Moreover, *Davis* determined that the foregone conclusion exception does not apply to acts of producing passcodes because those acts reveal "information arrived at as a result of using one's mind." *Id.* at 549-50. The State responds that this conclusion rests on a fundamental misunderstanding of the test. The State explains that an individual may be compelled to perform an act that implicitly admits to facts that reveal "information arrived at as a result of using one's mind" (*id.*), so long as

those implicitly admitted facts are foregone conclusions. See *Fisher*, 425 U.S. at 411. We agree with the State.

¶ 98        It is settled that "the attempt to force [a defendant] 'to disclose the contents of his own mind' " necessarily implicates the fifth amendment. See *Doe*, 487 U.S. at 210 (quoting *Curcio v. United States*, 354 U.S. 118, 128 (1957)). However, while disclosing the contents of a defendant's mind is a relevant consideration in determining whether an act is testimonial for purposes of implicating the fifth amendment, it has no bearing on whether the foregone conclusion test applies. The court in *Davis* conflated these two scenarios. Indeed, where a compelled act of production is deemed testimonial because it requires a defendant to disclose the contents of his mind, a foregone conclusion analysis is necessary, and the exception applies so long as the implicitly admitted facts—even facts that are conveyed as a result of using one's mind—are foregone conclusions. See *Fisher*, 425 U.S. at 411. Thus, we find *Davis* inapplicable.

¶ 99        Nor is it relevant to the application of the foregone conclusion doctrine that modern phones are capable of storing large amounts of information in comparison to physical documents. As noted *supra*, a cell phone is like a container, and the phone's passcode is like a key that unlocks the container. The testimony implicit in the act of unlocking a container is the same, regardless of the container's capacity. Likewise, the testimony implicit in the act of entering the passcode to a cell phone is the same, regardless of the phone's capacity.

¶ 100        Defendant's concern—that cell phones contain large amounts of information and that compelling the production of a passcode compels production of all the information on the phone—would be more suitably raised as a challenge to the scope of the search of his phone, which is a fourth amendment issue. Unless the incriminating evidence in question is compelled testimony under the fifth amendment, "its protection stems from other sources." *Id.* at 401. The fourth amendment protects "against seizures without warrant or probable cause and against subpoenas which suffer from 'too much indefiniteness or breadth in the things required to be "particularly described." ' " *Id.* (quoting *Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186, 208 (1946)). A defendant is free to challenge a search warrant under the fourth amendment if he believes it is too broad. See *People v. McCavitt*, 2021 IL 125550, ¶ 92 (search exceeding scope of search

warrant presumptively invalid under the fourth amendment). In this case, defendant did not contest the validity of the search warrant under the fourth amendment, and we find the concern with the phone's storage capacity is an unsuitable challenge under the fifth amendment.

¶ 101     Defendant's reliance on *Carpenter* is misplaced, as that case involved fourth amendment implications of "the ability to chronicle a person's past movements through the record of his cell phone signals." 585 U.S. at ___, 138 S. Ct. at 2216. *Carpenter*'s caution against extending existing precedent was made in response to a fourth amendment challenge of using cell phone tower location information to determine whether it was subject to a reasonable expectation of privacy. *Id.* at ___, 138 S. Ct. at 2222. Unlike the fourth amendment, the fifth amendment focuses narrowly on whether a person is compelled to provide self-incriminating testimony. Though advanced technology providing cell phones with greater storage capacity is significant under the fourth amendment, we find it irrelevant to the issue of whether the foregone conclusion exception to fifth amendment protection applies in the context of the compelled production of a cell phone's passcode.

¶ 102     Excluding *Davis*—which we deemed inapposite—there is nothing in the history of the foregone conclusion doctrine to suggest that it does not apply to acts of producing passcodes to cell phones. The consensus of Illinois courts is that the foregone conclusion doctrine applies to the compelled production of cell phone passcodes. Though courts have disagreed as to what facts must be foregone conclusions, none have disputed the actual application of the test in this context. Accordingly, we find the foregone conclusion doctrine is applicable here.

¶ 103     b. *Whether the Proper Focus Is on the Passcode or the Contents of the Phone*

¶ 104     Having found the foregone conclusion doctrine applicable, we observe the conflict among Illinois Appellate Court decisions is whether, in applying the test, the proper focus is on the passcode itself or on the information contained on the phone. In resolving this conflict, we direct our attention to the act at issue: the act of entering the passcode. The State's motion to compel requested the circuit court to order defendant to either provide or enter the passcode. The State did not seek to compel defendant to produce any information contained on the phone, as a search

warrant issued entitling the State to certain information it believes is contained on the phone. In a foregone conclusion analysis, focusing on the contents of the phone would disregard the fact that accessing the contents previously passed a probable cause determination by the circuit court by virtue of the search warrant. Accordingly, any information that may be found on the phone after it is unlocked is irrelevant, and we conclude that the proper focus is on the passcode. As such, *Spicer* is overruled.

¶ 105                      c. *Applying the Passcode to the*
                        *Foregone Conclusion Analysis*

¶ 106    In focusing on the passcode for purposes of our foregone conclusion analysis, for the exception to apply, the State must establish that, at the time it sought the act of production, it knew with reasonable particularity that (1) the passcode existed, (2) the passcode was within defendant's possession or control, and (3) the passcode was authentic. See *Hubbell*, 530 U.S. at 40-41.

¶ 107    Here, Detective Ummel testified that the phone was passcode protected, defendant had not provided the passcode, and the Clinton Police Department does not have the technology to "crack" the cell phone. This establishes that at the time it sought the act of production, the State knew with reasonable particularity that a passcode existed.

¶ 108    Ummel testified further that the phone was seized from defendant's person upon his arrest and that, on the bail bond sheet, defendant identified the phone number associated with the phone as his own phone number. This establishes that, at the time it sought the act of production, the State knew with reasonable particularity that defendant possessed the passcode.

¶ 109    Finally, we consider the authenticity of the passcode. The *Spicer* court concluded that the State could not satisfy the requirements of the foregone conclusion test because it could not confirm the authenticity of the passcode until after it was used to decrypt the defendant's phone. 2019 IL App (3d) 170814, ¶ 23; see also *Pollard v. State*, 287 So. 3d 649, 656 (Fla. Dist. Ct. App. 2019) (same). On the other hand, the appellate court in this case adopted the views of *Andrews*, 234 A.2d at 1275, and *Stahl*, 206 So. 3d at 136, and concluded that the authenticity

element is satisfied because the passcode is self-authenticating. 2021 IL App (4th) 210180, ¶ 101. Put another way, if the passcode unlocks the phone, the passcode is authentic, and such will be determined when the passcode is entered. *Id.*

¶ 110 We likewise conclude that the authenticity element is satisfied here by the self-authenticating nature of the passcode. We overrule *Spicer*, as its conclusion would not allow the State to utilize the foregone conclusion doctrine unless it could first somehow obtain the passcode by another means, which would necessarily obviate the need for a motion to compel the production of a passcode.

¶ 111 We adopt the reasoning of *Stahl*, in which the court observed:

"[T]he act of production and foregone conclusion doctrines cannot be seamlessly applied to passcodes and decryption keys. If the doctrines are to continue to be applied to passcodes, decryption keys, and the like, we must recognize that the technology is self-authenticating—no other means of authentication may exist. [Citation.] If the phone or computer is accessible once the passcode or key has been entered, the passcode or key is authentic." 206 So. 3d at 136.

¶ 112 We further observe that, if a valid passcode is not entered, the phone will not open, thus rendering it impossible for an invalid passcode to open the phone. The passcode self-authenticates by opening the phone, which in turn validates the passcode's authenticity. For these reasons, we conclude that, for purposes of the authentication requirement of the foregone conclusion doctrine, the passcode to a cell phone is self-authenticating when it is entered.

¶ 113 To summarize, the State established that, at the time it sought the act of production, it knew with reasonable particularity that the passcode existed, the passcode was in defendant's possession or control, and the passcode was self-authenticating. These implicit facts add "little or nothing to the sum total of the [State's] information." *Fisher*, 425 U.S. at 411. In other words, the act of entering the passcode has no testimonial value, as the facts implicit in the act are already known by the State. Therefore, the facts are foregone conclusions and insufficiently

testimonial to be privileged under the fifth amendment.[7] For these reasons, we conclude that the foregone conclusion doctrine applies as an exception to the fifth amendment privilege in this case.

¶ 114                                    III. CONCLUSION

¶ 115        We conclude as follows: (1) we have jurisdiction to consider this appeal under Rule 604(a)(1), as the substantive effect of the circuit court's judgment results in quashing the search warrant and suppressing evidence and the prosecutor certified that the circuit court's judgment substantially impaired the State's prosecution of the case; (2) compelling the act of producing the passcode to a cell phone by entering it into the phone is testimonial to the extent that performing the act of entering the passcode implicitly asserts that the person entering it has the ability to unlock the phone[8]; (3) the foregone conclusion test is applicable in the context of the compelled production of cell phone passcodes; (4) in applying the foregone conclusion test in this context, the proper focus is on the passcode itself rather than on the contents of the phone; and (5) the foregone conclusion doctrine applies as an exception to the fifth amendment privilege in this case.

¶ 116        For the foregoing reasons, we affirm the judgment of the appellate court, which reversed the circuit court's judgment denying the State's motion to compel and remand for further proceedings.

¶ 117        Appellate court judgment affirmed.

¶ 118        Circuit court judgment reversed.

¶ 119        Cause remanded.

---

[7]Because the State's motion to compel sought an order for defendant to either enter the passcode or provide it to officers, compliance with the order would not require defendant to disclose the passcode, and this court need not consider whether disclosing the passcode is sufficiently testimonial to be privileged where entering the passcode would not be.

[8]We reject the appellate court's conclusion that the compelled act of producing the passcode is nontestimonial.

¶ 120    JUSTICE NEVILLE, dissenting:

¶ 121    Police, executing a search warrant, obtained the contents of Keiron Sneed's cell phone, but they could not read the encrypted contents. The appellate court ordered Sneed to enter into his cell phone a code that instructs the cell phone to decrypt for police all of its encrypted contents. Because police have all the cell phone's contents, they may use any means at their disposal to decrypt the contents but one: they must not compel Sneed to decrypt or translate the contents of the cell phone. The Illinois Constitution provides: "No person shall be compelled in a criminal case to give evidence against himself ***." Ill. Const. 1970, art. I, § 10. Prosecutors intend to use the decrypted contents to prove Sneed committed forgery. The appellate court's order compels Sneed "in a criminal case to give evidence against himself," and therefore it violates article I, section 10, of the Illinois Constitution. Accordingly, as a consequence of the constitutional restriction, I would affirm the circuit court's order denying the State's motion to compel Sneed to enter the code to decrypt the cell phone's contents.

¶ 122                               I. FACTS

¶ 123    Sneed owned a cell phone, which held his phone records, his photographs, records of his searches, his e-mails and text messages, and other personal information. The cell phone automatically coded all of the information Sneed wrote into it and translated the information back from the code when Sneed punched in a brief instruction directing the phone to decrypt its contents.

¶ 124    Police obtained a warrant to arrest Sneed based on allegations that Sneed fraudulently cashed checks from Dairy Queen totaling less than $1000. When police arrested Sneed, they seized his cell phone. Police subsequently obtained a warrant permitting them to search the cell phone. Police could not decipher the phone's coded contents.

¶ 125    The State filed a motion asking the court to compel Sneed to direct the cell phone to translate for police the cell phone's coded contents so that prosecutors could use the contents to prove Sneed committed forgery. The circuit court denied the motion, and the appellate court reversed. The appellate court, like the majority here, never directly addressed the question of whether the order the State sought

- 30 -

would compel Sneed "in a criminal case to give evidence against himself."

¶ 126                              II. ANALYSIS

¶ 127        We review *de novo* the issue of whether the order the State sought would violate Sneed's constitutional rights. *In re Robert S.*, 213 Ill. 2d 30, 45 (2004). After finding that this court has jurisdiction over the appeal, the majority holds (1) that, under the lockstep doctrine, this court must treat the United States Supreme Court's interpretation of the fifth amendment (U.S. Const., amend. V) as a binding interpretation of article I, section 10, of the Illinois Constitution (*supra* ¶¶ 63-66); (2) that the United States Supreme Court's interpretation of the fifth amendment permits a court to order Sneed to decrypt, decode, or translate the contents of his cell phone for use against him in a criminal case (*supra* ¶¶ 103-13); (3) that the fifth amendment protects only very limited inferences from the act of producing the decryption of the cell phone's contents (*supra* ¶¶ 72-85); and (4) that the limited protection disappears altogether when the court can find the compelled production amounts to a foregone conclusion (*supra* ¶¶ 86-113). I disagree with the majority's four propositions.

¶ 128                             A. Jurisdiction

¶ 129        The majority asserts the circuit court's order denying the motion to compel "annulled or voided the search warrant" that permitted the State to search Sneed's cell phone. *Supra* ¶ 55. The majority misstates the order's effect. Police have already seized the phone and executed the search warrant. They have the cell phone's contents, but they cannot read them.

¶ 130        At least two private companies, Cellebrite and Grayshift, claim they can decrypt all cell phones on the market. See, *e.g.*, Mikey Campbell, *Grayshift Claims It Defeated Apple's Forthcoming "USB Restricted Mode" Security Feature*, Apple Insider (June 14, 2018), https://appleinsider.com/articles/18/06/14/grayshift-claims-it-defeated-apples-forthcoming-usb-restricted-mode-security-feature [https://perma.cc/RY9D-FCDP ]; Thomas Brewster, *The Feds Can Now (Probably) Unlock Every iPhone Model in Existence*, Forbes (Feb. 26, 2018), https://www.forbes.com/sites/thomasbrewster/2018/02/26/government-can-

access-any-apple-iphone-cellebrite/#9b41da1667a0 [https://perma.cc/4FFH-Y8GL]; see Orin S. Kerr & Bruce Schneier, *Encryption Workarounds*, 106 Georgetown L.J. 989 (2018). Also, "[m]any law enforcement agencies around the country already use one method of gathering encrypted evidence: state-sanctioned hacking." Adriana Christianson, *Locked Out or Locked Up: The Need for New Guidelines for Compelled Decryption*, 55 Suffolk U.L. Rev. 237, 263 (2022). But the commercial services charge thousands of dollars per project (see Thomas Brewster, *Mysterious $15,000 "GrayKey" Promises to Unlock iPhone X for the Feds*, Forbes (Mar. 5, 2018), https://www.forbes.com/sites/thomasbrewster/2018/03/05/apple-iphone-x-graykey-hack/#7683b3a2950f [https://perma.cc/6GJR-CDDU]; *Cellebrite UFED Series*, SC Mag. (Oct. 1, 2015), https://www.scmagazine.com/review/cellebrite-ufed-series [https://perma.cc/4TJD-ZT9Z]), and "[h]acking can be slow and expensive, costing thousands of dollars per device and taking a few weeks or longer, and sometimes it does not even work." Christianson, *supra*, at 264.

¶ 131     The Illinois State Police, De Witt County, and the Clinton Police Department understandably decided that the prosecution of Sneed for forging less than $1000 worth of checks did not justify the expense of hacking or commercial decryption. The circuit court's order denying the State's motion to compel Sneed to decrypt the cell phone's contents left the police and prosecutors with a choice of either spending thousands in pursuit of decryption to lead to a conviction for a relatively minor offense or trying to obtain the conviction without the decryption.

¶ 132     Although the order did not annul or void the executed search warrant, it increased the cost of decrypting the cell phone's contents. The order, by presenting the State with limited choices, effectively suppressed evidence and "substantially impair[ed]" prosecution of Sneed for forgery, and therefore the appellate court had jurisdiction over the State's appeal. See *People v. Drum*, 194 Ill. 2d 485, 489 (2000); Ill. S. Ct. R. 604(a)(1) (eff. Jan. 1, 2023) ("In criminal cases the State may appeal *** from an order or judgment the substantive effect of which results in *** suppressing evidence ***.").

¶ 133                      B. This Court Should Reject the Lockstep Doctrine

¶ 134    To avoid the central issue in this case—whether the order the State seeks will compel Sneed to give evidence against himself for use in a criminal case—the majority resorts to the lockstep doctrine adopted in *People v. Caballes*, 221 Ill. 2d 282, 312-14 (2006). *Supra* ¶¶ 63, 66. Under the lockstep doctrine, this court must adopt United States Supreme Court interpretations of the United States Constitution, no matter how poorly reasoned, as this court's interpretation of similar provisions of the Illinois Constitution, unless

> " ' "[w]e *** find in the language of our constitution, or in the debates and the committee reports of the constitutional convention, something which will indicate that the provisions of our constitution are intended to be construed differently than are similar provisions in the Federal Constitution." ' " *People v. Fitzpatrick*, 2013 IL 113449, ¶ 15 (quoting *Caballes*, 221 Ill. 2d at 310, quoting *People v. Tisler*, 103 Ill. 2d 226, 245 (1984)).

¶ 135    Most importantly, flawed analysis and unpersuasive reasoning do not qualify under *Caballes* as grounds for refusing to adopt the United States Supreme Court's interpretation of the United States Constitution as a binding interpretation of a parallel provision of the Illinois Constitution. The *Caballes* court discussed other jurisdictions that view flawed reasoning as grounds not to follow United States Supreme Court interpretations of constitutional language (*Caballes*, 221 Ill. 2d at 308), but the majority rejected that approach as one that would leave Illinois with an undesirable "jurisprudence of state constitutional law without regard to federal decisional law except, perhaps, as persuasive authority" (*id.* at 312-13). The *Caballes* court reasserted the limitations first stated in *Tisler*, which did not permit flawed federal analysis to serve as grounds for refusing to adopt a United States Supreme Court interpretation of the United States Constitution as a binding interpretation of similar language in the Illinois Constitution.

¶ 136    The lockstep doctrine received its clearest expression in *People v. Fitzpatrick*, 2011 IL App (2d) 100463, ¶ 12, *aff'd*, 2013 IL 113449, where the court said, "the lockstep doctrine would be largely meaningless if Illinois courts interpreting state constitutional provisions followed only those United States Supreme Court decisions with which they agreed."

¶ 137 The application of lockstep here particularly lacks justification. This court has expressly held that article I, section 10, of the Illinois Constitution differs significantly from the fifth amendment to the United States Constitution. *People v. McCauley*, 163 Ill. 2d 414, 424 (1994).

¶ 138 McCauley asked the circuit court to suppress the statement he made to police after police prevented his attorney from speaking with him. The *McCauley* court noted that binding United States Supreme Court precedent (*Moran v. Burbine*, 475 U.S. 412, 422-23 (1986)) established that the interrogation did not violate the fifth amendment. *McCauley*, 163 Ill. 2d at 454. The *McCauley* court held that three Illinois Supreme Court decisions, "along with the 1970 Constitutional Convention proceedings, demonstrate that requirements under our State constitutional guarantee (Ill. Const. 1970, art. I, § 10) differ substantially from the Federal and support suppression of defendant's statements under the circumstances presented here." *McCauley*, 163 Ill. 2d at 424. The court unequivocally rejected the lockstep doctrine, as the court said,

> "in the context of deciding State guarantees, Federal authorities are not precedentially controlling; they merely guide the interpretation of State law. [Citation.] [W]hile this court may, in construing State [constitutional] guarantee[s], look for guidance and inspiration to constructions of Federal guarantee[s] by Federal courts, final conclusions on construction of State guarantee[s] are for this court to decide." (Internal quotation marks omitted.) *Id.* at 436.

This court later reiterated the principle: "rather than 'blindly follow the reasoning of a United States Supreme Court decision at all costs,' this court should rely on its own case law, wisdom and reason to construe our state constitutional provisions." *People v. Lindsey*, 199 Ill. 2d 460, 467-68 (2002) (quoting *McCauley*, 163 Ill. 2d at 439).

¶ 139 The *McCauley* court emphasized that Bernard Weisberg, the delegate to the constitutional convention who advocated adoption of article I, section 10, assured the other delegates that the section would retain the law then in effect regarding self-incrimination. *McCauley*, 163 Ill. 2d at 440 (citing 3 Record of Proceedings, Sixth Illinois Constitutional Convention 1377 (statements of Delegate Weisberg)). At the time Illinois adopted the 1970 Constitution, the United States Supreme Court

had not yet ruled that police could bar an attorney from contacting a suspect in custody without violating the fifth amendment. The *McCauley* court held that the prior law, the interpretation of the self-incrimination clause in effect in 1970, remained the law in Illinois. *Id.* Again, the *McCauley* court's reasoning conflicts directly with lockstep reasoning.

¶ 140    The *Caballes* majority claimed the lockstep doctrine accorded with *McCauley* while flagrantly ignoring the reasoning of *McCauley*. The *Caballes* majority said "In *McCauley*, however, we did not ascribe a different interpretation to a provision of the state constitution than the Supreme Court had ascribed to the corresponding federal constitutional provision. Rather, we determined that the police conduct at issue implicated state due process concerns." *Caballes*, 221 Ill. 2d at 300-01. I cannot reconcile the *Caballes* court's statement with the *McCauley* court's explicit rejection of the lockstep doctrine and its explicit holding that "requirements under our State constitutional guarantee (Ill. Const. 1970, art. I, § 10) differ substantially from the Federal." *McCauley*, 163 Ill. 2d at 424.

¶ 141    The three justices who dissented from the majority opinion in *Caballes* reasserted that " 'flawed federal analysis' " must remain grounds for the Illinois Supreme Court to reject the United States Supreme Court's interpretation of the United States Constitution as a binding interpretation of the Illinois Constitution. *Caballes*, 221 Ill. 2d at 337 (Freeman, J., dissenting, joined by McMorrow and Kilbride, JJ.) (quoting *State v. Gomez*, 1997-NMSC-006, ¶ 19, 122 N.M 777, 932 P.2d 1). Flawed federal analysis has no bearing on the applicability of United States Supreme Court precedent under any form of lockstep. See Thomas B. McAffee, *The Illinois Bill of Rights and Our Independent Legal Tradition: A Critique of the Illinois Lockstep Doctrine*, 12 S. Ill. U. L.J. 1, 36-43 (1987).

¶ 142                    1. Illinois Supreme Court Justices Have
                            Rejected the Lockstep Doctrine

¶ 143    Apart from the majorities in *McCauley* and *Lindley* and the three justices who dissented in *Caballes*, at least five other justices of the Illinois Supreme Court have rejected the lockstep doctrine.

¶ 144    Justice Clark pointed out that nothing in the history of the Illinois Constitution showed the drafters intended to have the United States Supreme Court finally determine the meaning of the Illinois Constitution. *People ex rel. Daley v. Joyce*, 126 Ill. 2d 209, 223 (1988) (Clark, J., concurring). By the time of the adoption of the Illinois Constitution in 1970, the United States Supreme Court had made most of the federal bill of rights applicable to the states. *Id.* at 226. Justice Clark noted that "there would be little point in writing parallel guarantees into any State constitution if those guarantees were never to be interpreted more broadly. *** [The drafters] wanted the 'double protection' that only State constitutional guarantees could provide." *Id.*

¶ 145    Justice Heiple emphasized this court's "nondelegable duties" as the final interpreter of the Illinois Constitution. *People v. Mitchell*, 165 Ill. 2d 211, 234 (1995) (Heiple, J., dissenting). Justices Nickels and Goldenhersh similarly disagreed with the lockstep doctrine. See *In re P.S.*, 175 Ill. 2d 79, 96-97 (1997) (Nickels, J., dissenting, joined by Heiple, C.J.); *People v. Exline*, 98 Ill. 2d 150, 157 (1983) (Goldenhersh, J., dissenting, joined by Simon, J.).

¶ 146    Justice Simon persuasively argued,

"As justices of the highest court of the State of Illinois we take an oath of office to faithfully uphold the provisions of the State Constitution. We cannot delegate that duty to anyone—not to the legislature, nor the Governor, nor to any Federal court.

* * *

    In fulfilling our obligation to interpret and apply the Illinois Constitution we are obliged to broadly balance the basic principles contained in that document, and in doing so we are not limited by precedents of the United States Supreme Court. [Citations.] Of course, when we believe that a decision of that court 'achieves a fair balance between [the relevant] competing objectives' (*People v. Smith* (1983), 95 Ill. 2d 412, 422), we may choose to follow it. However, when a majority of the United States Supreme Court has adopted an interpretation of the Bill of Rights that we believe is insufficiently ample to effectively implement those guarantees, we are not frozen by it in interpreting the comparable provisions of our State Constitution. [Citations.]

- 36 -

\*\*\*

\*\*\* [W]hat five United States Supreme Court justices decide is only a binding interpretation of the Federal Constitution. It is the nature of the Federal system that we, as the justices of the Illinois Supreme Court, are sovereign in our own sphere; in construing the State Constitution we must answer to our own consciences and rely upon our own wisdom and insights." *People v. Rolfingsmeyer*, 101 Ill. 2d 137, 143-47 (1984) (Simon, J., specially concurring).

¶ 147    I agree with Justices Simon, Clark, Freeman, Nickels, Goldenhersh, McMorrow, Kilbride, and the majorities in *McCauley* and *Lindsey*. This court should not treat United States Supreme Court decisions as binding interpretations of the Illinois Constitution. Each supreme court justice should rely on her or his own conscience and wisdom in interpreting the Illinois Constitution.

¶ 148                    2. Commentators Argue Lockstep Improperly Prevents
                        This Court From Interpreting the Illinois Constitution

¶ 149    Several commentators agree with Justice Simon and the other justices who would reject the lockstep doctrine. " 'Lockstep' provides for mindless, formalist uniformity. When a state uses 'lockstep' it is actually abdicating its role in our federal system." Timothy P. O'Neill, *Escape From Freedom: Why "Limited Lockstep" Betrays Our System of Federalism*, 48 J. Marshall L. Rev. 325, 332 (2014); see Robert F. Williams, *In the Glare of the Supreme Court: Continuing Methodology and Legitimacy Problems in Independent State Constitutional Rights Adjudication*, 72 Notre Dame L. Rev. 1015 (1997).

¶ 150    Professor Paul Kauper told the delegates to our constitutional convention that "a state supreme court is free to give the freedoms recognized in the state constitution a reach that transcends interpretations given the fundamental rights by the United States Supreme Court. A state is free to develop its own higher standards." Paul G. Kauper, *The State Constitution: Its Nature and Purpose*, *in* Con-Con: Issues for the Illinois Constitutional Convention 3, 23-24 (Victoria Ranney ed., 1970).

¶ 151    Another commentator observed:

"[Lockstep analysis] is a peculiarly uncritical form of realism that takes no account of the possibility of error by the United States Supreme Court. ***

* * *

*** When the only justification offered both for adopting, and later rejecting, a given rule of law, is that in both instances it was the rule of decision in a Supreme Court case, it becomes difficult to imagine defending the practice." McAffee, *supra*, at 36-43.

¶ 152　　McAffee sharply criticized the mistaken assertions about Illinois constitutional history the *Caballes* court used as support for the lockstep doctrine. See *id.* at 20-28. James K. Leven more fully explored the history of the Illinois constitutions in *A Roadmap to State Judicial Independence Under the Illinois Limited Lockstep Doctrine Predicated on the Intent of the Framers of the 1970 Illinois Constitution and Illinois Tradition*, 62 DePaul L. Rev. 63 (2012). Leven notes first that, when the Illinois Supreme Court summarized constitutional history as justification for lockstep interpretations in *Caballes*, the court ignored several cases in which Illinois courts had treated United States Supreme Court cases "as a guide in the search for state constitutional meaning, not the exclusive source of wisdom that it would have been if the Illinois Supreme Court applied a strict lockstep approach." *Id.* at 73. The *Caballes* majority also misinterpreted the two primary resources on which the constitution's drafters relied.

¶ 153　　According to Leven, George Braden and Rubin Cohn in their treatise, The Illinois Constitution: An Annotated and Comparative Analysis (1969),

"noted that one of the reasons for state retention [of the bill of rights] was the primacy of state constitutional law protecting individual rights in circumstances in which the U.S. Supreme Court had denied such protection.

Another reason for retaining state constitutional provisions that are parallel to provisions in the U.S. Bill of Rights, according to Braden and Cohn, was the possibility that the U.S. Supreme Court could, in the future, dilute, weaken, or eliminate U.S. constitutional protection of individual rights in state court proceedings." Leven, *supra*, at 86.

¶ 154    Leven concluded, "the delegates strived to preserve the power of state court judges to determine the meaning of the Illinois constitution, unshackled from U.S. Supreme Court precedent." *Id.* at 88. Justice Clark summarized the appropriate standard. "[A]s to our State constitutional provisions, Federal precedents are not *stare decisis*. They are persuasive and not determinative. Where their reasoning persuades us, we should follow them. Where they do not, we should not." *Joyce*, 126 Ill. 2d at 225 (Clark, J., concurring).

¶ 155                          3. Under the Lockstep Doctrine, This Court Lacks the
                                    Power to Protect Illinois Citizens

¶ 156    This court must recognize the stakes involved in the debate over lockstep interpretation of the Illinois Constitution. Under the lockstep doctrine,

> "this court would be precluded from protecting the civil liberties of Illinois citizens should the United States Supreme Court decide to consistently favor police efficiency over the rights of the accused. *** [The lockstep doctrine] would preclude this court from protecting the individual liberties of Illinois citizens should such protection become essential in the future." *Tisler*, 103 Ill. 2d at 259 (Clark, J., specially concurring).

When the United States Supreme Court expands its interpretation of the rights protected by the United States Constitution, the expanded rights apply to citizens throughout the country, and no interpretation of a state constitution can authorize governmental intrusion on the protected right. See *People v. Aguilar*, 2013 IL 112116. When the United States Supreme Court diminishes the rights of citizens and permits the expansion of governmental powers over the citizens, under the lockstep doctrine, Illinois must expand the government's powers to the full extent permitted by the United States Supreme Court, in all but very limited circumstances. See O'Neill, *supra*, at 329-31.

¶ 157    The United States Supreme Court has broadly expanded governmental powers over citizens, leading commentators to advocate for a more federalist approach to constitutional interpretation, under which state courts would recognize that United States Supreme Court interpretations do not bind state court interpretations of state constitutions. "A primary focal point of this new federalism has been state courts'

reliance on state constitutions to provide rights no longer available under the Supreme Court's increasingly restrictive interpretation of the United States Constitution." Robert L. Brown, *Expanded Rights Through State Law: The United States Supreme Court Shows State Courts the Way*, 4 J. App. Prac. & Process 499, 501-02 (2002).

¶ 158　　In the years since Illinois adopted its latest constitution, the United States Supreme Court's expansion of government power has affected many different areas of constitutional interpretation. The Court permitted broad restrictions on students' rights to free speech in *Morse v. Frederick*, 551 U.S. 393 (2007). The Court expanded governmental immunity when it ruled victims of violent crimes committed by police lacked standing to sue the city for an injunction against further violent crimes committed by police. *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983). The Court expanded the government's powers of eminent domain when it ruled that a city's use of eminent domain for economic development did not offend the takings clause of the fifth amendment (U.S. Const., amend. V). *Kelo v. City of New London*, 545 U.S. 469 (2005). Further, in *McCauley*, this court responded to the restriction of fifth amendment rights in *Burbine*, 475 U.S. at 422-23. *McCauley*, 163 Ill. 2d at 435.

¶ 159　　The United States Supreme Court has especially expanded government power in the context of the fourth amendment (U.S. Const., amend. IV).

　　"The government's power to seize individuals who are suspected of crimes—by arresting, stopping, or otherwise detaining them—has expanded significantly in the twenty-first century. The Supreme Court's gradual redefinition of what constitutes a reasonable Fourth Amendment seizure has occurred without meaningful evaluation of whether the government needs additional seizure or detention power." Lauryn P. Gouldin, *Redefining Reasonable Seizures*, 93 Denv. L. Rev. 53, 53 (2015).

See *Michigan Department of State Police v. Sitz*, 496 U.S. 444 (1990) (highway sobriety checkpoints do not violate fourth amendment); *Illinois v. Wardlow*, 528 U.S. 119, 124-25 (2000) (police did not violate the fourth amendment when they searched a citizen in a high-crime area because he ran from police); *Kentucky v. King*, 563 U.S. 452, 462-63 (2011) (the exigency exception to the warrant requirement applies even if the police have created the exigency themselves by

knocking and announcing their presence rather than simply obtaining a warrant when possible).

¶ 160    We cannot forget that the United States Supreme Court recently overruled *Roe v. Wade*, 410 U.S. 113 (1973), and restricted the rights of women by holding that the federal constitution does not provide women with a right to abortion. See *Dobbs v. Jackson Women's Health Organization*, 597 U.S. ___, 142 S. Ct. 2228 (2022). The Court also limited the voting rights of citizens when it struck down as unconstitutional the protections of the Voting Rights Act of 1965 (52 U.S.C. § 10101 *et seq.* (2012)). *Shelby County v. Holder*, 570 U.S. 529, 556-57 (2013). One Supreme Court justice has recommended revisiting the constitutionality of the following established rights: (1) a citizen's right to use contraceptives (*Griswold v. Connecticut*, 381 U.S. 479 (1965)); (2) the right of same-sex couples to marry (*Obergefell v. Hodges*, 576 U.S. 644 (2015)); and (3) the right of same-sex couples to have sexual relations in the privacy of their homes (see *Lawrence v. Texas*, 539 U.S. 558 (2003)). See *Dobbs*, 597 U.S. at ___, 142 S. Ct. at 2301 (Thomas, J., concurring).

¶ 161    The limited lockstep doctrine adopted in *Caballes* requires this court to allow the expansion of governmental powers whenever five justices of the United States Supreme Court approve such expansion, even when this court believes the United States Supreme Court's decision does not persuasively state the intention of the framers of the Illinois Constitution, unless this court finds one of the very limited bases allowed under *Caballes* for refusing to adopt the United States Supreme Court's interpretation. To stress again the most significant aspect of *Caballes*, the decision, like all lockstep (or limited lockstep) decisions, does not allow this court to reject United States Supreme Court decisions based on their flawed analysis or unpersuasive reasoning.

¶ 162    In accord with our responsibility as final authoritative interpreters of the Illinois Constitution, and as protectors of the constitutional rights of Illinois citizens, we must reject the lockstep doctrine entirely. The Illinois Supreme Court justices cited above and the cited commentary persuade me that, especially in light of the rights and principles at stake, this court should partially overrule *Caballes* insofar as the *Caballes* court adopted the limited lockstep doctrine.

¶ 163                    4. *Stare Decisis* Should Not Bar This Court From
                           Reconsidering the Lockstep Doctrine

¶ 164       The four justices who signed on the decision in *Caballes* resolved the issue of
how this court should interpret provisions of the Illinois Constitution that use
language similar to provisions of the United States Constitution. The decision
operates as *stare decisis* on the issue.

¶ 165       This court has explained the reasons for adhering to our past decisions:

"The doctrine of *stare decisis* expresses the policy of the courts to stand by
precedents and not to disturb settled points. [Citation.] This doctrine is the
means by which courts ensure that the law will not merely change erratically,
but will develop in a principled and intelligible fashion. ***

To be sure, *stare decisis* is not an inexorable command. [Citation.]
However, we have consistently held that any departure from *stare decisis* must
be specially justified [citation] and that prior decisions should not be overruled
absent good cause [citations] or compelling reasons [citations]. *** [W]hen a
rule of law has once been settled, contravening no statute or constitutional
principle, such rule ought to be followed unless it can be shown that serious
detriment is thereby likely to arise prejudicial to public interests." (Internal
quotation marks omitted.) *Vitro v. Mihelcic*, 209 Ill. 2d 76, 81-82 (2004).

¶ 166       "*[S]tare decisis* must not be allowed to obscure the changing needs of society
or to veil the injustice resulting from a doctrine in need of re-evaluation." (Internal
quotation marks omitted.) *Froud v. Celotex Corp.*, 98 Ill. 2d 324, 336 (1983). "The
tenets of *stare decisis* cannot be so rigid as to incapacitate a court in its duty to
develop the law." *Alvis v. Ribar*, 85 Ill. 2d 1, 24 (1981), *superseded by statute on
other grounds as stated in Burke v. 12 Rothschild's Liquor Mart, Inc.*, 148 Ill. 2d
429, 440-41 (1992). "Stare decisis ought not to be the excuse for decision where
reason is lacking. [Citation.] *** [Our] law is free neither of some anomalies, nor
of everything illogical, but this is no reason for extending them." (Internal quotation
marks omitted.) *Dini v. Naiditch*, 20 Ill. 2d 406, 416 (1960).

¶ 167       The lockstep doctrine makes no difference for cases in which the United States
Supreme Court has reasoned persuasively about the meaning of a provision parallel

- 42 -

to a provision of the Illinois Constitution. The lockstep doctrine also makes no difference when an unpersuasive case expands the rights of individual citizens and restricts the reach of the government, as the individual rights apply to all citizens including the people of Illinois. The lockstep doctrine functions only when the United States Supreme Court uses faulty, unpersuasive reasoning to expand the reach of governmental powers and restrict the rights of citizens. The narrow majority in *Caballes* imposes on the State of Illinois the worst, most poorly reasoned decisions of the United States Supreme Court on the sole grounds that this court cannot find one of the limited bases permitted by *Caballes* for distinguishing the Illinois Constitution from the United States Constitution.

¶ 168     As the *Caballes* dissenters noted, and as Justices Simon, Clark, Heiple, Goldenhersh, and Nickels argued, we must not abdicate our responsibility as final interpreters of the Illinois Constitution. We must not apply United States Supreme Court interpretations of constitutional rights whenever a five-justice majority of the United States Supreme Court adopts an incorrect interpretation of a federal constitutional provision that parallels an Illinois constitutional provision. This case falls within the limited class of cases where this court should not apply *stare decisis*. See *Froud*, 98 Ill. 2d at 336; *Dini*, 20 Ill. 2d at 416. We must not permit our usual adherence to prior decisions to bar us from partially overruling *Caballes* insofar as it adopted the limited lockstep doctrine.

¶ 169                    C. This Court Should Not Apply *Fisher* to This Case

¶ 170     The majority uses the lockstep doctrine as authority for inflicting *dicta* from *Fisher v. United States*, 425 U.S. 391, 409 (1976), on the citizens of Illinois, despite the unpersuasive reasoning of *Fisher* and the inapplicability of the case to the facts in Sneed's case. *Supra* ¶¶ 63-67.

¶ 171     The *Fisher* majority had no grounds for making broad pronouncements on the applicability of the fifth amendment to documents a defendant possessed or prepared. The Internal Revenue Service demanded from Fisher's attorneys documents Fisher's accountants prepared. Fisher, unlike Sneed, neither possessed nor wrote the documents. The *Fisher* majority itself specifically distinguished the facts of that case from circumstances like the facts of the case against Sneed, as the

court said, "Special problems of privacy which might be presented by subpoena of a personal diary [citation] are not involved here." *Fisher*, 425 U.S. at 401 n.7.

¶ 172   Despite the factual limits the *Fisher* Court acknowledged, excepting from its reach personal papers like virtually all of the content of cell phones, the majority here expands *Fisher*, treating it as binding authority for the propositions that (1) the Illinois Constitution permits the State to compel defendants to produce self-incriminating documents, because the self-incrimination clause does not apply to any documents, (2) the self-incriminating aspects of an "act of production" receive only very limited constitutional protection, and (3) the limited protection disappears entirely under the "foregone conclusion" doctrine if the State can show that it already knew what the act of production disclosed. *Supra* ¶¶ 63-102.

¶ 173                    1. This Court Should Not Apply *Fisher* to Digital Technology

¶ 174   The expansion of *Fisher* to cases involving demands for owners to decrypt the contents of their cell phones ignores the United States Supreme Court's warning: "When confronting new concerns wrought by digital technology, [courts should be] careful not to uncritically extend existing precedents." *Carpenter v. United States*, 585 U.S. ___, ___, 138 S. Ct. 2206, 2222 (2018) (citing *Riley v. California*, 573 U.S. 373, 386 (2014)).

¶ 175   In *Riley*, a police officer seized Riley's decrypted cell phone in the course of a lawful arrest and found on the phone evidence of criminal activity. *Riley*, 573 U.S. at 378-79. The trial court found the fourth amendment permitted the search. *Id.* at 379. Prosecutors used the evidence from the phone to convict Riley for attempted murder. The California Court of Appeals affirmed the conviction. *Id.* at 379-80.

¶ 176   The United States Supreme Court first noted that in *United States v. Robinson*, 414 U.S. 218 (1973), the court established the principle that a lawful arrest justifies a search incident to the arrest "and a mechanical application of *Robinson* might well support the warrantless searches at issue" in *Riley*. *Riley*, 573 U.S. at 386. The court emphasized the "immense storage capacity" of cell phones, which "could just as easily be called cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers." *Id.* The *Riley* Court said:

- 44 -

"First, a cell phone collects in one place many distinct types of information—an address, a note, a prescription, a bank statement, a video—that reveal much more in combination than any isolated record. Second, a cell phone's capacity allows even just one type of information to convey far more than previously possible. The sum of an individual's private life can be reconstructed through a thousand photographs labeled with dates, locations, and descriptions ***. ***

\* \* \*

*** [A] cell phone search would typically expose to the government far *more* than the most exhaustive search of a house: A phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form—unless the phone is." (Emphasis in original.) *Id.* at 394-97.

¶ 177    The *Riley* court concluded:

"[W]hile *Robinson*'s categorical rule strikes the appropriate balance in the context of physical objects, neither of its rationales has much force with respect to digital content on cell phones. ***

We therefore decline to extend *Robinson* to searches of data on cell phones, and hold instead that officers must generally secure a warrant before conducting such a search" *Id.* at 386.

¶ 178    Under the reasoning of *Riley*, this court should not mechanically apply *Fisher* to the content of cell phones. To decide whether to apply *Fisher* under the circumstances of this case, this court should consider the purpose of the protection against compelled self-incrimination and the probable effect of its ruling.

¶ 179    The majority here, like the *Fisher* Court, largely ignores the purposes of the constitutional protection against compelled self-incrimination. The United States Supreme Court explained:

"[The constitutional privilege against self-incrimination] grows out of the high sentiment and regard of our jurisprudence for conducting criminal trials and investigatory proceedings upon a plane of dignity, humanity and impartiality. It is designed to prevent the use of legal process to force from the lips of the

- 45 -

accused individual the evidence necessary to convict him or to force him to produce and authenticate any personal documents or effects that might incriminate him. Physical torture and other less violent but equally reprehensible modes of compelling the production of incriminating evidence are thereby avoided. The prosecutors are forced to search for independent evidence instead of relying upon proof extracted from individuals by force of law. The immediate and potential evils of compulsory self-disclosure transcend any difficulties that the exercise of the privilege may impose on society in the detection and prosecution of crime. While the privilege is subject to abuse and misuse, it is firmly embedded in our constitutional and legal frameworks as a bulwark against iniquitous methods of prosecution. It protects the individual from any disclosure, in the form of oral testimony, documents or chattels, sought by legal process against him as a witness." *United States v. White*, 322 U.S. 694, 698-99 (1944).

¶ 180    The appellate court's order here undermines the dignity, humanity, and impartiality of proceedings against Sneed by forcing him to produce for prosecutors decryptions of documents the State will use to prove him guilty of forgery.

¶ 181    The court should also consider the likely effects of extending *Fisher* to digital devices. As one commentator pointed out, "allowing law enforcement such easy access to devices [by compelling defendants to decrypt their phones] does not restore some pre-existing status quo or ideal balance. Rather, it shifts to the government an unprecedented ability to scour very personal and private data that did not even exist twenty years ago." Laurent Sacharoff, *What Am I Really Saying When I Open My Smartphone? A Response to Orin S. Kerr*, 97 Tex. L. Rev. Online 63, 72 (2019).

¶ 182    Another commentator said:

"the easier it is for police to obtain compelled decryption orders, the more they will do so. ***

    ***

    *** [W]hen the government seizes a device pertinent to a serious or violent crime, it can invest its resources in unlocking the device or forcing the help of

third parties to try to get what's inside. But government resources are finite. A low bar is an invitation to conduct more searches in more cases by making available at a relatively low cost such a substantial quantum of intimate information about any person. Greater protection will require law enforcement to use these encryption workarounds, forcing the government to pick and choose when it will invest its finite resources and try to decrypt seized devices. It will naturally reserve its finite resources for more serious cases. *** But making it easy for the government to obtain compelled decryption orders ensures that cell phone searches will occur more often. Imposing a state constitutional barrier will reserve this intrusive investigative practice for the serious cases that deserve it." (Internal quotation marks omitted.) David Rassoul Rangaviz, *Compelled Decryption & State Constitutional Protection Against Self-Incrimination*, 57 Am. Crim. L. Rev. 157, 197-98 (2020).

¶ 183     The majority asserts that Sneed's argument concerning the extensive information police will acquire under the appellate court's order reflects only fourth amendment issues. *Supra* ¶ 100. Sneed concedes that police complied with the fourth amendment when they obtained the contents of his cell phone, and he concedes police and prosecutors will not violate his constitutional rights by using those contents to prosecute him. Sneed contests only the means by which prosecutors seek to derive evidence they can present in court from the cell phone. Although police and prosecutors may use any other means available to them to decrypt the cell phone without violating Sneed's rights, Sneed argues they violate the Illinois Constitution if they compel him to give evidence against himself by decrypting the phone. The court must acknowledge the extent of the phone's contents in deciding how and whether to apply existing case law regarding self-incrimination to digital devices. See *Riley*, 573 U.S. at 386-97.

¶ 184                    2. This Court Should Not Adopt as Illinois
Constitutional Law the *Fisher* Court's Holding
That the Self-Incrimination Clause Does
Not Apply to Documents

¶ 185     In accord with the reasoning of *White* and the purpose of the self-incrimination clause, Illinois courts have held that the constitution forbids the State from

- 47 -

compelling a defendant to produce documents the State could use as a step in prosecuting the defendant for a crime. *People ex rel. Bowman v. Woodward*, 63 Ill. 2d 382, 386-87 (1976) (constitution forbids the State from compelling the defendant to produce expert witness reports and X-rays); *10-Dix Building Corp. v. McDannel*, 134 Ill. App. 3d 664, 671 (1985) ("cancelled checks and bank deposit slips sought in discovery were precisely the types of documents entitled to fifth amendment protection under *Fisher*"). Finally, this court stated:

> "The privilege against self-incrimination forbids the compulsory production of documents, containing assertions made by the person invoking the privilege, [citation] and it has also been held to preclude compulsory production of documents in his possession, even though they do not contain assertions by him, where such documents will furnish a link in the chain of evidence by which he might be convicted of a crime." *People v. Myers*, 35 Ill. 2d 311, 333 (1966).

¶ 186    Courts of other states have reached similar conclusions. First, in *Armitage v. State*, 13 Ind. 441 (1859), prosecutors charged Armitage with possessing counterfeit bills and sought an order directing Armitage to produce some of the bills. The Supreme Court of Indiana held, "If the notes were really in the possession of the defendant, as alleged in the indictment, the Court could not compel him to produce them on the trial, for the reason that he might be, and if the charge was true, certainly would thereby be, furnishing evidence against himself." *Id.* at 443. Second, in *Riddle v. Blackburne*, 110 N.Y.S. 748, 748 (App. Div. 1908) (*per curiam*), the plaintiff accused the defendant of libel and sought an order compelling the defendant to produce the allegedly libelous document. The *Riddle* court denied the request, as it said, "[t]he effect of granting this application would compel the defendant to furnish evidence which might be used against him in a criminal prosecution." *Id.* Third, a Pennsylvania court considering a charge of forgery held the courts could not compel the defendant to produce the allegedly forged document, "for it is a constant and invariable rule that in criminal cases the party shall never be obliged to furnish evidence against himself." (Internal quotation marks omitted.) *Commonwealth v. Meads*, 11 Pa. D. 10, 12 (1901). Fourth, the prosecutor in *Phillips v. State*, 480 S.W.2d 648 (Tex. Crim. App. 1972), charged the defendant with forging a check, and the trial court ordered the defendant to produce the forged instrument. The court of criminal appeals said, "Requiring the appellant to produce an instrument, in the presence of the jury,

which was the basis of his prosecution violated his Fifth Amendment right to be free from self-incrimination. Appellant's objection that the prosecutor's demand violated that right should have been sustained." *Id.* at 649.

¶ 187    Prior to today, the Illinois Constitution precluded the State from compelling a defendant to produce documents, like cancelled checks, bank records, diaries, phone logs, or Internet search histories, for use against the defendant in a criminal case. See *Lamson v. Boyden*, 160 Ill. 613 (1896); *Myers*, 35 Ill. 2d at 333. This court should reject as unpersuasive the *Fisher* Court's holding that protections against self-incrimination do not apply to demands for documents the defendant wrote or kept.

¶ 188                    3. This Court Should Not Adopt the Act of Production
                        Doctrine as Part of Illinois Constitutional Law

¶ 189    The *Fisher* Court, in *dicta* inapplicable to the facts of the case before it, held that the United States Constitution permitted the federal government to compel a defendant to produce documents the defendant himself wrote because the government had not compelled him to write the documents. *Fisher*, 425 U.S. at 409-10. The *Fisher* Court held that the fifth amendment protected the defendant from only the testimonial implications arising from the act of production. *Id.* at 410-11. The court then radically and indefensibly circumscribed the implications that it would count, ignoring all the implications prosecutors would actually ask triers of fact to draw from the compelled act of production.

¶ 190    Professor Nagareda pedagogically explained with examples some of the errors of the *Fisher* majority:

> "The crucial starting point of the act-of-production doctrine is to decouple the content of documents from the act by which they are produced. To determine whether a given act of production triggers the Fifth Amendment, under the logic of Fisher, one must look only to that act itself. Most importantly, one must ignore that the documents themselves are incriminatory in content. As such, the perspective mandated by Fisher takes on an unreal, make-believe quality. It is rather like the Wizard of Oz imploring supplicants to pay no attention to the man behind the curtain. As one commentator accurately

observes: '[T]he act-of-production theory is woefully out of touch with the realities of subpoena practice,' for '[b]oth prosecutors and witnesses served with document subpoenas are invariably interested in the documents' contents, not the testimonial component of the act of production.' ***

\* \* \*

*** [I]t is the compulsion of that act of giving evidence in itself—whether in the form of speech, production of preexisting documents, or otherwise—that violates the Fifth Amendment. To put the point another way, the compulsion of a person to engage in any production of self-incriminatory 'evidence' is unconstitutional, not just compulsion of those acts of production that happen to incriminate the producer above and beyond the content of what is produced." Richard A. Nagareda, *Compulsion "to Be a Witness" and the Resurrection of Boyd*, 74 N.Y.U. L. Rev. 1575, 1601-03 (1999).

¶ 191 For his argument that the act of production doctrine violated the fifth amendment, Professor Nagareda elucidated the history of the protection against compelled self-incrimination starting with an eighteenth-century case, *The King v. Purnell* (1748) 96 Eng. Rep. 20 (KB). The government charged Purnell with criminal neglect of his duties as vice chancellor of Oxford University because he failed to punish two persons who spoke treasonable words. *Id.* at 20. The government sought to compel the university to produce university statutes establishing the duties of the vice chancellor—but Purnell, as vice chancellor, bore responsibility for responding to the request for documents. *Id.* The court refused to issue the order because courts may not "make a man produce evidence against himself, in a criminal prosecution." *Id.* The documents constituted evidence of the vice chancellor's duties because of their contents, not because of an inference arising from the act of production. The *Purnell* court observed the government had a right to inspect the university statutes, including the statutes establishing the vice chancellor's duties. The court emphasized that the government's right to the documents did not give the government a right to compel Purnell to produce the documents. *Id.*

¶ 192 Prior to 1769, Lord Mansfield stated as established common law, "in a criminal or penal cause, the defendant is never forced to produce any evidence; though he

should hold it in his hands, in Court." *Roe v. Harvey* (1769) 98 Eng. Rep. 302, 305 (KB).

¶ 193    Early in the nineteenth century, the United States Supreme Court explained the fifth amendment in a manner that accorded with *Purnell*: "The rule clearly is, that a party is not bound to make any discovery which would expose him to penalties \*\*\*." *United States v. Saline Bank of Virginia*, 26 U.S. (1 Pet.) 100, 104 (1828). State courts followed the same rule. See *Armitage*, 13 Ind. at 442-43; *Riddle*, 110 N.Y.S. at 748; *Meads*, 11 Pa. D. at 12; *Phillips*, 480 S.W.2d at 649.

¶ 194    Illinois courts found defendants protected from compelled document discovery based on the potentially incriminating aspects of the evidence sought without regard to any inference from the act of production. In *Lamson*, 160 Ill. at 617, the plaintiff sought an order compelling the defendant to produce documents showing the defendant cornered the market on corn and doubled its price. The trial court refused to grant the order (*id.*), and the *Lamson* court affirmed, noting that cornering the market on a commodity violated criminal laws and holding that, "[w]henever a witness is excused from giving testimony upon the ground, that his answers will tend to criminate him, or subject him to fines, penalties or forfeitures, he cannot be compelled to produce books or papers which will have the same effect" (*id.* at 618). The content of the books or papers, not the limited inferences the *Fisher* Court permits from an act of production, would show the offense.

¶ 195    The trier of fact would infer from the X-rays and the expert witness reports in *Woodward* that the content of the documents accurately reflected the conditions of their subjects. *Woodward*, 63 Ill. 2d at 386-87. The checks and bank records at issue in *10-Dix* would support an inference that certain transactions occurred, based on the content of the documents and not based on an inference from an act of production. *10-Dix*, 134 Ill. App. 3d at 671. In *People v. Zazove*, 311 Ill. 198, 206 (1924), the court held, "the production of the paper would furnish a link in the chain of evidence by which [the defendant] might be convicted of perjury on the criminal trial, and he was entitled to the benefit of his constitutional right to refuse to furnish that link."

¶ 196    Professor Sacharoff explains that the inferences arising from an act of production include inferences based on the documents' content.

"[T]he witness who produces the documents does not intend, *by that act*, to communicate any message at all. The person producing child pornography does not intend that act to be symbolically understood to mean 'I possess these images.' Rather, as an inadvertent by-product of the act, we may draw the ordinary inferences that the person possesses the files because that person was able to physically produce them. Or, if a person produces a bank account statement, we may infer the piece of paper is authentic because it came from the person's files.

The act of producing documents is thus not testimonial or communicative in the ordinary way. \*\*\*

\*\*\*

\*\*\* Producing a hard copy of child pornography \*\*\* implicitly and directly communicates possession of the child pornography and likely knowing possession—both central elements of the crime.

\*\*\*

\*\*\* The use of a password to open a device also communicates that the device likely belongs to the person and that the person possesses, perhaps knowingly, the files on the device." (Emphasis in original.) Sacharoff, *supra*, at 66-67.

¶ 197    The "fundamental folly of [the *Fisher* Court's] effort to decouple document content from the act of document production" (Nagareda, *supra*, at 1594) has especially pernicious effect in the context of compelled decryption of cell phone contents. By translating the contents of his cell phone, Sneed will give the State evidence that he possessed specific photographs, he sent specific text messages and e-mails on specific dates, he made specific calls to specific phones, he searched the web for specific information, he videorecorded certain performances of material possibly protected by copyright, or he offered to share videorecordings of copyrighted material in exchange for specific favors (see *United States v. Anderson*, 741 F.3d 938, 946 (9th Cir. 2013) ("a person is guilty of criminal copyright infringement if he or she 'willfully' infringes a copyright for the purpose of commercial advantage or private financial gain")), along with nearly endless

personal information about himself. The cell phone would show (1) whether Sneed received a phone call from a relative or friend from Texas or Florida or Idaho and (2) whether, after he received the phone call, he searched the Internet for information from Planned Parenthood and (3) whether he then contacted an obstetrician or a medical clinic and (4) whether his friend or relative from Texas or Florida or Idaho then came to Illinois for a brief visit and (5) whether the GPS tracker on his phone showed a trip to the obstetrician's office or medical clinic.

¶ 198 Prosecutors will ask the trier of fact here to infer from the content of Sneed's cell phone that he sent a specific image of a check to a bank on a specific date. *Supra* ¶ 15. Prosecutors would not have the evidence of that specific image of a check if Sneed did not instruct the cell phone to decrypt its contents. The fanciful limitation the majority seeks to impose on the implications arising from the compelled production bears no relation to the reality of the inferences the State will tell triers of fact to draw from the production. See Nagareda, *supra*, at 1601-02. The majority expands *Fisher* far beyond its own limits (see *Fisher*, 425 U.S. at 401 n.7), ignoring the United States Supreme Court's warnings about applying prior precedent to the novel circumstances presented by current cell phone and computer technology (see *Carpenter*, 585 U.S. at ___, 138 S. Ct. at 2222). The majority uses *Fisher*, treated as binding authority interpreting the Illinois Constitution, first to abolish Illinois's long-standing protection from compelled production of incriminating documents (*supra* ¶ 65; see *Woodward*, 63 Ill. 2d at 386-87; *Zazove*, 311 Ill. at 206; *Lamson*, 160 Ill. at 618), and second as authority for ordering Sneed to produce for the State the most private and personal information about all aspects of his life. Because the act of production doctrine willfully ignores the most basic implications from a defendant's act of producing incriminating documents, which effectively states "I wrote these incriminating words" or "I kept this incriminating record of my acts," this court should not adopt the act of production doctrine as part of its interpretation of the self-incrimination clause of the Illinois Constitution.

¶ 199 4. This Court Should Not Adopt the Foregone
Conclusion Doctrine as Part of Illinois Constitutional Law

¶ 200 The majority finds the production compelled here fits under the *Fisher* Court's doctrine that compelled testimony does not offend the fifth amendment if it counts

as a "foregone conclusion" in that it "adds little or nothing to the sum total of the Government's information." *Fisher*, 425 U.S. at 411; *supra* ¶ 87. Professor Nagareda persuasively explains that the doctrine violates the constitutional protection against self-incrimination.

> "Whether a person is compelled to assume the status of a 'witness against himself' turns upon what the person is compelled to do by the government—to utter self-incriminatory speech, in the case of interrogation, or to produce self-incriminatory documents, in the case of a subpoena. The status of being a witness against oneself has nothing to do with the extent of the government's preexisting knowledge of what the witness might have to say, whether orally through speech or implicitly through action. In the trial context, for instance, a witness is no less of a witness when the attorney doing the questioning already knows the answers to the questions that she poses.

> *** In no other area of Fifth Amendment discourse does the Court make the protection of that provision depend upon the degree to which the government already knows what the witness is compelled to disclose. To the contrary, it would be just as unconstitutional for the government to compel self-incriminatory oral statements from a person whom the government already knows, to a moral certainty, to have committed a given crime as it would be for the government to compel the exact same statements where the government has little preexisting knowledge of the person's guilt. When it comes to self-incriminatory oral statements, in other words, the government's preexisting knowledge is irrelevant. The Fifth Amendment, instead, stands as a prohibition upon a particular method of information gathering in itself, apart from the extent of information that the government already has." Nagareda, *supra*, at 1597-98.

¶ 201    In *Commonwealth v. Davis*, 220 A.3d 534 (Pa. 2019), the Commonwealth argued that, under the foregone conclusion doctrine, the court should compel the defendant to decrypt his cell phone. The Pennsylvania Supreme Court echoed Nagareda's observation, saying,

> " 'It is as if we were asked to rule that a confession could be coerced from an accused as soon as the government announced (or was able to show) that [in] a future trial it could produce enough independent evidence to get past a motion

for a directed verdict of acquittal.' " (Emphasis omitted.) *Id.* at 550 (quoting *Goldsmith v. Superior Court*, 152 Cal. Rptr. 3d 76, 87 n.12 (Ct. App. 1984)).

The court held, "we conclude the compulsion of a password to a computer cannot fit within [the foregone conclusion] exception." *Id.*

¶ 202　　I would hold that, under article I, section 10, of the Illinois Constitution, the extent of the government's knowledge can never provide grounds for compelling a citizen to produce evidence for the government to use in a criminal prosecution of the citizen. The court should not import from the unpersuasive decision in *Fisher* the ill-considered foregone conclusion doctrine and use it to eliminate the protections promised to Illinois citizens in article I, section 10, of the Illinois Constitution and to expand the government's power to intrude into all aspects of its citizens' lives.

¶ 203　　　　　　　D. The Illinois Constitution Forbids Compelled
　　　　　　　　　　　Decryption of Cell Phones

¶ 204　　Because the majority ignores the text of the Illinois Constitution, it never addresses the question of whether the order the State seeks would compel Sneed "in a criminal case to give evidence against himself," in violation of article I, section 10, of the Illinois Constitution.

　　　　"One way to think about compelled decryption is to imagine requiring a witness to take the stand and translate a secret language into English. While one can argue that physically taking the stand and translating a language is unlike unlocking a cell phone, does it not produce the same result? Both require using mental processes to relay facts that are unknown to the prosecution." Evan Kennedy, *Protecting the Fifth Amendment: Compelled Decryption in Indiana*, 54 Ind. L. Rev. 691, 701 (2021).

¶ 205　　One scholar who has advocated for the wide expansion of the government's power to compel defendants to divulge all the contents of their cell phones, Professor Kerr, argues that entering the code does not translate the documents because the person who enters the code could not, without use of the cell phone, decrypt the text. Because the user does not know how the cell phone encodes and

decodes the text, his acts cannot constitute translation. Orin S. Kerr, *Compelled Decryption and the Privilege Against Self-Incrimination*, 97 Tex. L. Rev. 767, 781 (2019).

¶ 206 Kerr's argument ignores the fact that we often use tools to perform tasks we could not perform without the tools. The use of a tool to perform a task one cannot perform without the tool does not change the nature of the act. Punching a telephone number into a telephone's keypad is an act of making a telephone call. Punching the passcode into the cell phone is an act of translating or decrypting all the encoded information back into English.

¶ 207 The order the State seeks here compels Sneed to direct his cell phone to translate for police all the documents stored on his cell phone. A defendant who translates his own diary and phone log into English for police does not assert only that he knows how to translate the documents. He gives police and prosecutors—to use as evidence against him—documents showing that he sent specified text messages or made phone calls to specified phone numbers at specified times, he made specified searches of the Internet, he took specific photographs, and he went to places specified by the cell phone's GPS. He provides police and prosecutors with almost limitless personal information. The appellate court's order compels Sneed, in a criminal case, to give evidence against himself in violation of article I, section 10, of the Illinois Constitution.

¶ 208 E. A Ruling in Favor of Sneed Will Not
Foreclose the Government From Obtaining
Decryptions in Appropriate Circumstances

¶ 209 In cases where the government especially needs the decrypted contents of a cell phone, it has one means always available for overcoming the restrictions of article I, section 10: "the court on motion of the State may order that any material witness be released from all liability to be prosecuted or punished on account of any testimony or other evidence he may be required to produce." 725 ILCS 5/106-1 (West 2020). When the court grants such immunity, the witness can no longer claim the protection of section 10, because he no longer faces any threat of criminal prosecution. See *People ex rel. Cruz v. Fitzgerald*, 66 Ill. 2d 546, 549 (1977). "[I]mmunity from use and derivative use is coextensive with the scope of the

privilege against self-incrimination, and therefore is sufficient to compel testimony over a claim of the privilege." *Kastigar v. United States*, 406 U.S. 441, 453 (1972).

¶ 210                                III. CONCLUSION

¶ 211    I agree with the majority that police did not violate Sneed's constitutional rights when they obtained the encrypted contents of his cell phone. I also agree with the majority that prosecutors would not violate Sneed's constitutional rights if they use those contents to prosecute Sneed for forgery. However, article I, section 10, of the Illinois Constitution forecloses police and prosecutors from compelling Sneed to decrypt, decode, or translate those contents for use against him in prosecution of criminal charges.

¶ 212    The justices of this court have taken an oath to uphold the Illinois Constitution. In accord with that oath, before this court adopts the United States Supreme Court's interpretation of constitutional language as a binding interpretation of the Illinois Constitution, this court must critically assess the United States Supreme Court's reasoning and reject it when it fails to persuade us. Insofar as *Caballes* binds this court to the United States Supreme Court's constitutional interpretations, even when those interpretations result from unpersuasive reasoning, we must partially overrule *Caballes*.

¶ 213    I would find that, regardless of the *Fisher* Court's pronouncements about the application of the fifth amendment to documents, the Illinois Constitution forbids court orders compelling individuals to produce self-incriminating documents for use against them in criminal cases. I would reject the distinction between inferences arising from the act of production and inferences arising from the content of the documents produced. I would also reject the foregone conclusion doctrine, as the extent of the government's knowledge can never overcome the constitutional provision that "[n]o person shall be compelled in a criminal case to give evidence against himself." Ill. Const. 1970, art. I, § 10.

¶ 214    The appellate court's order directs Sneed to translate for police incriminating documents the defendant created. The appellate court's order compels Sneed, in a criminal case, to give evidence against himself in violation of article I, section 10, of the Illinois Constitution. Therefore, I would reverse the appellate court and

affirm the circuit court's order denying the State's motion to compel Sneed to decrypt the contents of his cell phone.

¶ 215     JUSTICE O'BRIEN took no part in the consideration or decision of this case.